## HUBER HOGE, Inc., v. SMITH & WESSON, Inc.

District Court, D. Massachusetts. January 24, 1928.

No. 3062.

Morton Collingwood, of Plymouth, Mass., for plaintiff.

Wooden, Small & Mallary, of Springfield, Mass., for defendant.

BREWSTER, District Judge. The above-entitled case was tried to a jury when it appeared that no disputed issue of fact was involved. An alternative verdict was returned, the jury finding for the plaintiff in the sum of $5,195.87 with an alternative that if, as matter of law, the plaintiff was not entitled to recover, a defendant's verdict might be entered upon order of this court. A motion to set aside the verdict for the plaintiff and to direct a verdict for the defendant was duly filed, which has been considered on oral arguments and briefs.

The plaintiff holds itself out to the public as engaged in the business of sales promotion and advertising. In the course of its advertising business, it solicits advertisements for magazines and newspapers. It seeks out a prospective advertiser, and, after agreeing upon the publications to be used, it submits a schedule of dates, prepares and submits for approval the matter to be inserted in the publications, prepares plates for the publisher, and arranges with the latter to run the advertisement on the dates specified. The publisher sends to the plaintiff a bill for the advertisement, which bill the plaintiff sends to the advertiser, who remits the full amount of it to the plaintiff. From this amount the plaintiff deducts his commission, which is usually 15 per cent., and remits to the publisher the balance. The actual expense of preparing the matter for publication is paid by the advertiser at cost plus 15 per cent.

It appeared in the evidence that one Louis J. Goldman, representing the plaintiff, solicited the defendant for advertisements and, on January 23, 1926, sent to the defendant a communication which embodied the agreement between the plaintiff and the defendant. This letter reads as follows:

"415 Lexington Avenue, New York City,
January 23, 1926.

"Mr. F. H. Wesson,
"Smith & Wesson, Inc.,
"Springfield, Mass.
"Dear Mr. Wesson:

"Did not receive a letter from you this morning, and knowing just how you are tied up with your jury worries, I thought it would simplify matters if I wrote a letter confirming the conversation between Mr. Harold, yourself and the writer regarding the details of our business agreement.

"As stated to you, we have no contracts, but merely that we may have an acknowledgment that embodies the mutual understanding of our business methods, I am setting them down herewith.

"We charge the advertiser card rates on all magazine and newspaper advertising, except where we are allowed more than the customary 15%, on which we charge you 15% above cost to us.

"On all art work, electrotypes, typesetting or other mechancial work ordered on your account, we will charge cost plus 15%.

"On publication bills, wherever cash discount is allowed us we give you the full amount of the discount we receive providing that payment is made to us prior to the

discount date allowed to us by the publication. On production bills we allow all cash discounts with the understanding that the entire bill be paid by the 10th of the month.

"This agreement is terminable at any time simply upon notification, and we merely ask protection on any current commitments made on your request.

"Your acknowledgment of this letter constitutes our authorization.

"Very sincerely yours,

"Huber Hoge, Inc.

"Louis J. Goldman."

A number of proposed schedules were submitted to the defendant, out of which it selected a schedule calling for publication in the Saturday Evening Post in April, June, August, October, December, all in 1926, and February, 1927, and in Collier's Weekly in May, July, September, November, all in 1926, and January and March, 1927.

On February 4, 1927, the plaintiff wrote to the defendant that it had entered this order and would proceed to finish up the advertisements and submit them for approval. The advertisements were finished, submitted, and approved, and the space in the two publications seasonably reserved by the plaintiff.

The advertisements were run in the Saturday Evening Post on April 17, June 19, and August 21, 1926, and in Collier's Weekly on May 22, July 24, September 18, 1926. For all of these publications bills were sent by the publisher to the plaintiff and paid by the defendant. Prior to September 3, 1926, Goldman severed his connection with the plaintiff and went with another advertising company, the Spafford Company, Inc. On September 3, 1926, the defendant advised the plaintiff that inasmuch as Goldman was associated with the Spafford Company, Inc., it was going to handle its advertising henceforth through that concern, and requested the plaintiff to have all future bills for advertising submitted through the Spafford Company, Inc., rather than through the plaintiff. On September 16, 1926, the defendant wrote to the plaintiff as follows:

"September 16, 1926.

"Huber Hoge Company,

"415 Lexington Avenue,

"New York, N. Y.

"Gentlemen:

"Pursuant to our correspondence of September 3, terminating the relationship between your organization and ours, please take this as notification that any or all bills whatever which may be outstanding for amounts due your organization in the preparation of plates, art work, copy or other charges incident to preparation of same, be immediately forwarded to us in order that we may send our check in full to wind up the entire matter.

"Your prompt attention to the above will be appreciated.

"Yours truly, Smith & Wesson, Inc.

"F.H.W.—s F. H. Wesson."

On the following day the plaintiff wired the defendant as follows:

"White Plains N Y

"Smith and Wesson

"Springfield Mass.

"Curtis Publishing Co notify us your letter Sept third instructs them to transfer to Spafford space from Oct insertion on to completion of your order and state they are receiving formal order from Spafford. As these conflict with our original order not yet cancelled they ask confirmation or cancellation from us by tomorrow their closing date on this insertion. We have postponed cancelling or ordering back plates thus far to give you opportunity to reply to our letter and we hoped reconsider or modify your instructions. Lacking such further word from you we have no choice but to honor your letters of instructions cancel our order to Curtis then permitting transfer of space and billing to Spafford and to call upon you for payment of agency differential which we have earned on this and remaining insertions as outlined in our letters to you and to Spafford.

"Huber Hoge Inc."

To which the defendant replied on September 18 as follows:

"Springfield Mass 1926 Sep 18

"Huber Hoge Inc

"415 Lexington Ave

"New York N Y

"Replying your wire seventeenth see our letter seventeenth Smith & Wesson"

This telegram admittedly referred to the letter of September 16, above quoted.

A bill for all outstanding amounts due the plaintiff for preparatory work was submitted and paid as was the bill covering the advertisement in the September 18 issue of Collier's Weekly.

The advertisements were run in the subsequent issues of the Saturday Evening Post and Collier's Weekly according to the original schedule, and in these advertisements the advertising matter that had been prepared by the plaintiff was used. The only change in the situation was that the bills

for the advertising were, at the request of the defendant and with the consent of the plaintiff, rendered by the publisher to the Spafford Company, Inc., rather than to the plaintiff, and presumably that company received the commission thereon. In any event, the plaintiff received no commissions upon the sums paid for these six issues, and the plaintiff now looks to the defendant for the 15 per cent. commission upon the sums paid for the advertisements which appeared in the Saturday Evening Post on October 23 and December 18, 1926, and February 19, 1927, and in Collier's Weekly in the issues of November 20, 1926, January 15 and March 19, 1927. The total amount of commissions, or differentials as they are called by the advertising agencies, amounted to $5,025, which sum, with interest, is the amount due the plaintiff if it is entitled to recover.

None of the above facts were disputed, and the only question presented is whether upon these facts the defendant can be held for the so-called agency differential.

I entertain some doubts as to just what was the relationship created by the correspondence and dealings of the parties, but assuming that the contract was one of agency whereby the defendant employed the plaintiff to place certain advertisements, it will be noted from the above statement of facts that it was the publisher and not the defendant who fixed and paid the commission. There is no express agreement on the part of the defendant to pay the plaintiff for its services or to continue the relationship, whatever it may have been, for any definite period. On the contrary, the agreement expressly provided for the termination of the relationship at any time.

The plaintiff's contention is that the agreement created the relationship of principal and agent, and that it, as such agent, having fully performed its part in placing the advertisement, was entitled to its compensation therefor, and that while defendant could at any time place its advertisements through another agency, it could not thereby deprive the plaintiff of its compensation.

With most of the propositions of law for which the plaintiff has contended in its elaborate brief I am in full accord, but I cannot agree that they constitute the applicable law in view of the expressed provisions of the contract out of which the relationship between the plaintiff and the defendant arose. I have no doubt that, in the absence of any agreement modifying these rights and obligations, a principal may revoke at pleasure the authority of his agent, but that he may not by such revocation deprive the agent, who has fully performed his undertaking, of the fruits of his labor. Mechem on Agency (2d Ed.) § 1543; O'Connell v. Casey, 206 Mass. 520, 92 N. E. 804.

But in the case at bar the parties had seen fit to reduce to writing the agreement between them, in which agreement they not only expressly defined the rights of the defendant to terminate its relations with the plaintiff "at any time simply upon notification," but they also defined rather clearly the defendant's obligations to the plaintiff that would arise in the event of such termination. The plaintiff's letter of January 23, 1926, contained a statement that, in the event of notification of termination, the defendant would be liable only to reimburse the plaintiff for any current commitments made at the request of the defendant. This liability was fully discharged by the payment of the bills rendered by the plaintiff, including one for the advertisement in Collier's Weekly of September 18, the only publication for which a bill was rendered by the publishers to the plaintiff after defendant's letters of September 3 and September 16. The plaintiff cancelled its orders for space, and thereupon subsequent advertisements were, apparently with plaintiff's consent, run pursuant to orders received from the Spafford Company, Inc., and were billed to them and paid by the defendant. Out of these transactions arose no current commitments made at the request of the defendant.

Plaintiff's case proceeds on the assumption that the words, "we merely ask protection on any current commitments made on your request," appearing in its letter of January 23, are meaningless and are to be given no force or effect. It is a familiar rule of construction that a contract should, if possible, be so construed as to give effect to all parts of it. I am not persuaded that these words have no legal significance. Obviously the defendant read them as a true definition of its obligation in case of termination and proceeded accordingly.

If these provisions had not been a part of the contract, it is hardly conceivable that the defendant would have deliberately pursued the course it did, and the plaintiff cannot now be heard to say that the contract should be read as if the sentence had not been incorporated. The letter was written by a duly authorized representative of the plaintiff and purported to state the agreement between the parties.

926

No suggestion has been made by counsel, nor was there any evidence to warrant a jury in finding bad faith on the part of the defendant or that it derived any pecuniary advantage in changing agents. The Spafford Company, Inc., was the one that profited by the change more than the defendant. While the conduct of the plaintiff's former employee Goldman may not be altogether praiseworthy, I am unable to discern any particular reason why the defendant should be called upon to make good the loss sustained by reason of such conduct if the defendant had a right to place its advertising through another agency.

Both in the correspondence and in its brief the plaintiff concedes the defendant's right to terminate the agency at any time. I think it might well be argued that by this concession the plaintiff had swept away the foundation upon which its cause of action is based. The plaintiff's compensation came, not from defendant, but from the publisher. If the defendant is now to be held liable in damages to the plaintiff, it is because it, without right, took the advertising out of the hands of the plaintiff and placed it through another agency. The agreement was that defendant could at any time do this and that, in such event, the liability extended only to "protection on any current commitments."

Furthermore, it must not be overlooked that the plaintiff, in cancelling its orders with the publishers, acquiesced in the change of agents. As a result of this cancellation, bills were rendered to the defendant through the Spafford Company, Inc., rather than through the plaintiff. If the plaintiff in so doing proceeded upon a misconception of its rights and duties in the premises, it created a situation as a result of which it was unable to obtain from the publisher the commission which it otherwise would have received. No liability on the part of the defendant could be created by the plaintiff by merely notifying the defendant that it would pursue this course and would look to the defendant for the commissions or differentials.

Having reached the conclusion therefore that, upon the admitted and uncontroverted facts submitted to the jury, the defendant would be, as matter of law, entitled to a verdict, the defendant's motion to set aside the verdict for the plaintiff is allowed, and, in accordance with the terms of the alternative verdict, a verdict for the defendant may be entered, and judgment on the verdict may be entered.