PERLES & STONE, INC., a Corporation, v. CHILDS COMPANY, a Corporation, Appellant.—104 S. W. (2d) 361.

Division One, April 21, 1937.

*Neun, D'Arcy & Neun* for appellant.

*Boyle & Priest, G. T. Priest* and *Robert E. Moloney* for respondent.

HAYS, J.—This case was here on another occasion and is reported in 337 Mo. 447, 84 S. W. (2d) 1052, wherein an order granting plaintiff a new trial was affirmed and the cause remanded. On the retrial the defendant again had a verdict, and from the trial court's order setting the same aside on the specified ground of error in giving to the jury defendant's Instruction No. 3, the defendant has appealed. Among the many matters of error assigned by the defendant (appellant) the two of greatest importance are, (a) that said instruction was correct and proper and (b) if the instruction was bad the order cannot be justified since on the whole case the defendant's demurrer, which was refused, should have been given. As the latter point may be all-sufficient it will be first considered, and in such consideration perhaps the minor assignments will be effectually, though incidentally, determined, without need of reference to them.

The controversy is over the commission, concededly earned, by the person or persons who procured and consummated for the defendant a sublease of certain of its business property situated in St. Louis which the defendant held by a 99-year lease. In substance the facts are alleged in the petition as follows:

Perles & Stone in September, 1928, were copartners, engaged in the real estate business in St. Louis. About said date they secured on behalf of defendant the execution of a certain lease for defendant wherein and whereby defendant subleased said premises to Rossman, Inc., for a term of twenty-five years for a total rental value of $707,916.67 upon which a reasonable commission would be two per cent thereof. Rossman took possession of the premises as lessee of defendant. On account of said services so rendered the defendant became indebted to said firm therefor in the reasonable and usual commission, laid at $14,158.33. The copartners later formed the plaintiff corporation and assigned to it the claim herein asserted. The defendant's second amended answer, on which this trial was had, was a general denial.

The retrial took a different course from that of the former trial. It will appear that for the procuring and consummating of the sublease a commission contract in writing between the defendant and one Siegel was entered into. It contained a provision that Siegel was "the only

broker entitled to a commission" and that the same would be paid him. That contract was in the form of a letter directed and sent to the Childs Company by Siegel for acceptance or rejection by placing said company's signature thereon or by refusing to do so. In putting on its case the plaintiff declined to introduce this contract in evidence. Although anticipatory to do so, it may be noted here that when defendant later on offered that instrument in evidence, on the specific ground of ratification on the part of plaintiff, the court excluded it upon plaintiff's objection to its competency. We shall as briefly as may be follow the course of the evidence given in plaintiff's behalf.

Touching the relation of Siegel to Perles & Stone, which originated in October, 1927, and thereafter continued, Mr. Perles testified that Siegel was a salesman of the firm and as such "was to receive one-half of the commission for any deals which he brought in our office, and any deals originating—and any deals that we put him on from our office he was to receive one-third of the commission that we received for our services." Siegel later, as defendant's witness, testified to the same effect, but took the position that he originated the transaction and hence was entitled to one-half of the commission.

Shortly after the above date Perles & Stone initiated correspondence with the New York office of defendant and from its manager, Mr. Bode, received the suggestion "that if you have anybody who is definitely interested in this property, you submit to us a proposition thereon, after which we shall be very glad to answer any question as to our giving up this space."

Thereafter Perles & Stone undertook to interest divers persons in the property but failed to interest any. Early in July, 1928, Perles directed Siegel to write Bonds, Inc., and Rossman, Inc., at New York, recommending the property to them. Though having an office of his own in another locality in St. Louis Siegel wrote as requested at Perles & Stone's office and upon the stationery of Perles & Stone. He signed the letters in his own name. Though Perles & Stone directed Siegel to write to Rossman, Inc., as stated, the firm never at any time between the time Siegel went to New York and the effective date of the sublease wrote or proposed anything to the Childs Company about Rossman or any other lessee.

In the latter part of August, 1928, Siegel went to New York where he called on Bonds, Inc., and wrote Perles & Stone that he had an appointment with Abe Rossman. He returned there about September 29th, for from there he wrote Perles on that day; and Rossman wrote to Mr. Perles under date October 5, 1928, in reference to certain locations in St. Louis and East St. Louis, which it appears Perles had written him about, and Rossman incidently stated at the close that he and Siegel had their first meeting with the Childs Company the day before and had another appointment for the day on

which he wrote and expressed his belief that the deal with the Childs Company would be closed on that date.

On October 21, following,—so Perles testified, but it must have been September 20th—Rossman came to St. Louis where he was by Siegel and Perles shown the Childs property, after which they returned to the office of Perles & Stone and from there by telephone called Mr. Pellens at New York. Connection made, Siegel identified himself to Pellens and said, according to Perles' version: "Mr. Rossman is in our office and had gone over the proposition of making the lease with the Childs Company, that the terms were satisfactory—we would forward a lease upon their acceptance by wire. That was the substance of that conversation and later Childs wired acceptance." A few days later Rossman returned to New York. Meanwhile the lease was prepared by the firm's lawyers; also "a contract for the firm of Perles & Stone with Childs Company for a commission" in the form of a letter. Both of which instruments Siegel was to take to New York to present to the Childs Company. Siegel sent Pellens a telegram (no date is shown on this exhibit) confirming the telephone conversation of the same day and stating that Siegel expected to return to New York with the lease on Pellens' confirmation of acceptance by wire. Pellens' telegram of acceptance was dated September 20, 1928, and addressed to Siegel and accepted the proposition "provided we can agree on the details of the lease which you are to submit and that the matter can be closed on or before October 1st." [Note: The lease transaction was in fact closed on October 17. By said letter under date line New York, September 29, 1928, written by Siegel to Perles, Siegel reported that the lease did not appeal to "them in its present form . . . but I am sure we can thrash all matters out all right."]

Up to the time when the Childs Company signed the commission contract with Siegel there was no communications between the office of Perles & Stone and the Childs Company about the lease. The lease itself was by plaintiff put in evidence.

Perles, for plaintiff, testified that on November 7, 1928, he called Pellens by telephone and had a conversation as follows: "I asked if it was Mr. Pellens talking, and when I received the connection he said, 'Yes.' I said, 'This is Mr. Perles of Perles & Stone, St. Louis relators, speaking.' He said, 'Oh, yes, Mr. Perles, what can I do for you?' I said, 'Mr. Pellens you knew all the time that Mr. Siegel represented Perles & Stone in this matter between your company and Rossman, did you not?' He said, 'Why sure I did.' he said, 'what is the trouble?' I said, 'Well, I saw a contract made out between the Childs Company and Earle Siegel representing that he was representing himself and there was no other agent involved in the deal.' I said,

'I want you to wire me at once that you knew all the time that Mr. Siegel represented us in that matter.' ''

For plaintiff the point is made in substance that the evidence shows that the relationship of principal and agent existed between Perles & Stone and Siegel; that the defendant knowingly seduced and persuaded the agent to violate the confidential and fiduciary duty owed by him to his principals and to practice fraud upon the principals. In support of this proposition the plaintiff cites 13 C. J., p. 415, sec. 438; 6 R. C. L., p. 719, sec. 126; Mees v. Grewer (N. D.), 245 N. W. 813-14-16; Atlee v. Fink, 75 Mo. 100.

The principle of law invoked is sound, but we think it is not pertinent to the facts before us. In substance that principle is as announced in the Atlee case, supra: A secret agreement of an agent made with the adverse party to a contract whose interest and those of the agent's employers were antagonistic is void, as against public policy and as tending to induce unfaithful conduct by a fiduciary and for other reasons there stated (75 Mo. l. c. 103-104).

In the present case the interests of Perles & Stone and the Childs Company were not antagonistic. Indeed, the sum agreed upon as commission was practically the same as that alleged in the petition to be usual and reasonable. From the record it does not appear that there was any secrecy on the part of the Childs Company. All its dealings were had with Siegel; the correspondence was had with Siegel as an individual; Siegel presented the letter which formed the contract with only his name as an individual signed to it. If Perles & Stone and Siegel had some secret arrangement among themselves as joint adventurers, as the facts would seem to indicate, or as principal and agent as claimed, it was incumbent upon Perles & Stone to so advise the Childs Company. No duty rested upon the latter to make inquiry as to the private relation existing between the firm and Siegel. From all appearances Siegel had *carte blanche* to initiate, negotiate, and consummate the lease transaction, and the contract as he did with respect to commission therefor. The evidence compels the conclusion that the services of Siegel alone were the inducing and efficient cause in the procurement of the lease. And it was not until after the consummation of it and the execution of the contract that Perles & Stone bestirred themselves to apprise the Childs Company of their concern about the commission. The evidence compels the reasonable inference that the company had no interest or choice regarding the recipient of the commission and had no improper motive in relation to that matter, as fraud cannot be presumed. So far as can be gathered from the record the defendant did no more than exercise, in good faith and without fraud or covin, its right to make a contract—a right safeguarded by constitutional guarantee. So that, as between the parties herein, the contract is to be taken as valid.

And if in respect of Siegel's relation to Perles & Stone the former was recreant to his trust, they, apprised of the terms of the contract, had a then present right of action against him in the premises; perhaps also, an appropriate remedy in equity as against the Childs Company and Siegel for the supposed fraud. But they adopted a different and more restricted course.

What has been said in the paragraph just preceding substantially disposes of the plaintiff's insistence that, irrespective of the written contract, it made a submissible case in *quantum meruit* upon the evidence to the effect that "Childs Company got the benefits of the services of Perles & Stone rendered through its agent and also by themselves." Unquestionably, we think, the evidence as to the services of Perles & Stone, considered apart from those of Siegel, was wholly insufficient to take the case to the jury; it was insufficient to support an inference of fact that Perles & Stone performed the services and to support an implication of law that Childs Company promised to compensate them. How far then, if at all, can the plaintiff, in order to make out its case, rely upon Siegel's services rendered as Perles & Stone's agent?

If plaintiff can adopt Siegel's acts—and plaintiff's position evidently implies that plaintiff does adopt them—privity between Perles & Stone and Siegel which was essential, but was otherwise utterly lacking, would be thereby established. In view of our conclusions announced above, and of the fact that plaintiff maintained in the court below throughout the trial, and here, in another connection, on appeal, still maintains that it did not ratify the contract, and in view of the rules of law to which we shall refer we think this point should be ruled against plaintiff.

Plaintiff's action is based upon implied contract, pleaded generally under common count in *indebitatus assumpsit* as for a *quantum meruit* of compensation, laid at an allegedly reasonable sum stated. Where, by its terms, the express contract contains nothing more than the law would imply, it is optional with the plaintiff to declare in general *indebitatus assumpsit,* or upon the express contract.

In such a case it is said the plaintiff does not repudiate the contract nor seek to avoid it, but, under his common-law count in *indebitatus assumpsit* as for a *quantum meruit* as for a compensation he offers the contract in evidence to sustain his case, and his proof of compliance with its terms. "Under these circumstances defendant will not be permitted to assert that an express contract exists, for the purpose of defeating a recovery on an implied contract. . . . *The rule applies, however, only . . . where the service performed under the special contract would raise an implied promise if there was no special promise. It is always necessary that what has been done on the part of the plaintiff should be sufficient of itself to raise an im-*

*plied promise.* [5 C. J., p. 1386, sec. 17. Italics ours.] If the terms of the contract were shown, they must control. [Amer. Surety Co. v. Fruin, etc., Const. Co., 182 Mo. App. 667, l. c. 674-5, 166 S. W. 333.] And it follows that the law will not imply a contract where an express one exists unless they are substantially identical. [5 C. J., p. 1388, secs. 17 and 19.] That they are widely and very substantially different in the case at bar has been sufficiently pointed out.

From all of which we conclude that the defendant's demurrer to the evidence should have been sustained and that the cause should be remanded with directions to the trial court to set aside its order granting a new trial and to reinstate the verdict and enter judgment thereon dismissing the cause. It is so ordered. All concur.