**KRUPNICK AND ASSOCIATES, INC.,**
(Plaintiff) Appellant,

v.

Edward J. HELLMICH et al., (Defendants)
Respondents.

No. 49993.

Supreme Court of Missouri,

Division No. 1.

April 13, 1964.

Motion for Rehearing or to Remand
Denied May 11, 1964.

to furnish advertising services to respondents. A jury returned a verdict in favor of appellant for $16,302.60, plus interest. The trial court subsequently set aside the verdict and entered judgment for respondents. This appeal is from the judgment so entered. Because of the amount in controversy, we have jurisdiction of the appeal.

Appellant, Krupnick and Associates, Inc., is a Missouri corporation, engaged in the business of an advertising agency in the City of St. Louis. The individual respondents, Edward J. Hellmich and Ernest E. Hellmich, were partners in business conducted in St. Louis under the names, "The Branchell Co.," and "Hellmich Mfg. Co." The other individual respondents, Emil Hellmich and Karl Kress, were also partners in the Hellmich Mfg. Co. Hellmich Mfg. Co. manufactured melamine plastic dinnerware. The Branchell Co. sold the products of Hellmich Mfg. Co. The two partnerships operated jointly and any obligation under the contract in question was the obligation of both partnerships. We will refer to the individual respondents collectively as "Branchell." Lenox Plastics, Incorporated, also a party respondent, is a Delaware corporation, licensed to do business in Missouri. It purchased the business of Branchell in January, 1958.

In its petition, appellant alleged that it agreed with Branchell, in August, 1957, to prepare an advertising campaign for Branchell for 1958 on which Branchell agreed to spend $143,242.25 for advertising, with appellant to receive 15% of that amount as compensation for its services, and that appellant, in reliance on the agreement, performed all services required of it for the advertising campaign. The petition alleged the sale of Branchell's business to Lenox Plastics, Incorporated, in January, 1958, and that Lenox thereafter carried on the business; that on or about January 31, 1958, respondents attempted to cancel the agreement by directing appellant not to place any more advertising, although the appellant had fully performed the work to be done by

Newmark & Baris, Irl B. Baris, Michael N. Newmark, St. Louis, for appellant.

G. M. Redman, La Tourette & Redman, St. Louis, for respondents.

WELBORN, Commissioner.

This is an action for damages for breach of an alleged contract under which appellant, Krupnick and Associates, Inc., was

it under the agreement. Damages were sought in the amount of $18,929.85, which amount was reduced by amendment at the trial to $16,302.60.

Admitting the allegation regarding the sale to Lenox, separate answers of Lenox and of the individual respondents, jointly, denied the essential allegations of the petition.

Appellant's witnesses at the trial were Harvey Brown, vice-president and account executive of appellant, who handled the Branchell account, and Sam Krupnick, appellant's president. From their testimony, viewed in the light most favorable to appellant, the jury could have found that Branchell did, in October, 1957, after a series of conferences with representatives of Krupnick, establish an advertising budget for the year 1958 in which approximately $143,242 would be spent on periodical advertising; that thereafter Krupnick went to work on a final plan for such advertising, which included "which media to run, which month to carry, which type of ad * * * and a budget breakdown of how much for each ad and which publication, which month * * *." Such program was prepared and submitted in writing to Branchell early in December, 1957, the document detailing the objectives of the program and the type of advertising to be employed. A detailed schedule was included, showing the months in which advertisements were to be placed in each of ten magazines of general, nation-wide circulation, such as Life, Good House-keeping, and in five trade publications. The program showed the amount budgeted to be spent for each advertisement insertion. The total was $120,839.10 for national publications and $27,647.96 for trade publications. Minor modifications were subsequently made in the plan which resulted in a planned expenditure of $143,242.25. Early in December, 1957, Branchell approved the program and told Krupnick to go ahead and try to get the ads ready for the program. It was agreed "to proceed, get the photog-raphy done, get the type set, get the ads prepared as early as possible so they could be shown or part of them shown at the sales meeting at the end of the year."

Upon Branchell's approval of the program, Krupnick proceeded to complete the advertisements. The program called for ads to be run in spring publications, in March, April and May, with the same advertisements being repeated in the fall, so that additional work was not required for the fall publications, once the first advertisements had been prepared. Krupnick completed 90% of the work required to produce the advertisements involved in the program. At sales meetings of Branchell personnel in January, 1958, the personnel were told of the advertising program of the company for 1958, which was the program Krupnick had prepared.

Prior to January, 1958, negotiations had been under way for Lenox' acquisition of the Branchell business. Krupnick's president, Sam Krupnick, was aware of the negotiations. Early in January, 1958, Ernest E. Hellmich, who was then in Pittsburgh, telephoned Sam and told him that the sale had been completed; that he would continue to be in charge of the St. Louis business; that Krupnick should go ahead with the 1958 advertising program as planned, but that he could give no assurance for the following year.

On January 31, 1958, a conference was held between representatives of Lenox and Krupnick. At that meeting, Krupnick personnel explained to Lenox the work which had been done toward completion of the program, which, according to Brown, was 90% completed. Lenox' representatives told Krupnick that Lenox did not wish to carry out the advertising program planned for Branchell and that only a few of the advertisements planned should be placed in accordance with express authorization.

Advertisements were placed by Krupnick in some trade publications and one national

publication. The amount billed respondents for such advertisements and other production costs totalled $34,558, which was paid. On April 11, 1958, William Trotter, advertising manager of Branchell, wrote Brown: "In order to clear this matter, this letter is necessary to inform you that unless new jobs are initiated by The Branchell Company, we should receive no additional invoices from Krupnick & Associates. If we do receive additional invoices, we cannot be expected to be responsible for payment."

There was no evidence presented of an express discussion of Krupnick's compensation in connection with the 1958 advertising program. The evidence on this subject showed that, in 1956, Krupnick made a study of Branchell's operations and presented a "Sales Betterment Plan," which included 100 specific recommendations regarding Branchell's operation. Among the recommendations was one for an advertising budget of $420,000 for the year 1957. Branchell paid Krupnick $19,600 for the study and report. However, Branchell did not accept fully the advertising budget recommended and spent, in 1957, approximately $172,000 for advertising, through Krupnick.

The Sales Betterment Plan was a document of several hundred pages. Included was a 24-page statement of Krupnick on the subject of "Invoicing Policies and Compensation," the first sentence of which read: "This is our method of compensation and invoicing clients for the services we perform." Under the heading, "SOURCES OF COMPENSATION," the following appeared:

"A. We derive our compensation from four sources:

"1. Commission we receive from the purchase of space, time, materials, and services for clients from media and sources which normally include standard agency commission in their charges.

"a. Standard agency commission is derived from the 15% discount allowed by the medium used. The medium bills its time or space to the agency at full rate, less the 15% discount. The difference between the full rate and the net total is the agency commission. This discount is not available to clients on direct purchase. Example:

| | |
|---|---|
| Total cost of time or space at full card rate | – $100.00 |
| Less standard 15% agency commission | – 15.00 |
| Total cost to agency | – 85.00 |
| Agency gross income | – 15.00 |

Approximately 70% of the agency's total compensation comes from this source.

"2. Commission added by us to the cost of media, services, or material necessary to produce advertising, purchased for the client from sources which do not include standard agency commission in their charges.

\* \* \* \* \* \* \* \* \* \*

"3. Charges based on established rates for standard or special services on commissionable and noncommissionable advertising performed by the agency for the client.

\* \* \* \* \* \* \* \* \* \*

"4. Fees, agreed on in advance with the client, to compensate for work performed from which commissions earned are insufficient."

The final page of the treatise on "Invoicing Policies and Compensation" read as follows:

"IX. CLIENT AND AGENCY WORKING AGREEMENT

"Our arrangement with clients is very simple. It keeps the interest of the client on equal terms with that of the agency, since basically we are entering a partnership when they grant us the right to handle their advertising.

"A. While we enter client-agency relationships with the expectation they will continue indefinitely, either party is free to cancel at any time upon 90 days' written notice by registered mail.

"B. In event of client's termination of our agreement by the prescribed 90 days notice, space and/or time used in print or broadcast media whose firm closing dates fall within the 90-day period are to be placed by us.

"C. In the event client has approved advertising copy of any kind prepared by us which has not been used by the termination date of the agreement; and if subsequently this copy is used, we are to be paid an amount equivalent to the commission on the media (print and/or radio TV) in which this copy is used. Such payment is to be arranged by the client with the agency taking over from us.

"D. In event of termination, all rejected or unused advertising plans and ideas prepared by us remain our property to use as we see fit. This, provided such use does not involve the release of any confidential information regarding the client's business or methods of operation.

"E. In the event that contracts with advertising media are transferred to another advertising agency, after expiration of the agreed-on interval following notice, we retain no rights to commissions on short-rate bills nor obligation to add back commissions to refunds made by media by reason of earning a lower rate.

"F. The client may, at any time during the life of our agreement, and upon reasonable notice, examine our files, books and records pertaining to the handling of his advertising."

The evidence showed that the 1957 advertising program was carried on by Krupnick in accordance with these policies.

The trial court, in setting aside the verdict in favor of appellant, did so on the grounds that "all undisputed evidence establishes conclusively that the only agreements plaintiff had was to receive commissions for the purchase of advertising placed with advertising media which was approved by the client before placement with the media, and to receive commissions added to the cost of media, services, or material necessary to produce advertising purchased for the client from sources which do not include standard agency commission in their charges. The evidence shows conclusively that defendants had not defaulted in either of the above two respects, and likewise, plaintiff made no such claim. This case as plaintiff has admitted is not an action based on quantum meruit. Likewise, there is no evidence to support plaintiff's theory that plaintiff was entitled to his 15% commission on the basis of the 1958 tentative budget ($143,242.00) which was projected for the entire year. Therefore, it is the

conclusion of the Court that plaintiff failed to make a submissible case."

■■ In our opinion, the trial court properly reached its conclusion. Krupnick's statement of "Invoicing Policies and Compensation" was in effect an offer to clients to whom the proposal was submitted to perform advertising services in accordance with such offer. The client, by ordering Krupnick to perform advertising services, thereby entered into a principal-agent relationship (H. W. Kastor & Sons Advertising Co. v. Elders, 170 Mo.App. 490, 156 S.W. 737; 2 Socolow, The Law of Radio Broadcasting, Section 339, pages 665–666; Annotation 53 A.L.R.2d 1139) with Krupnick. Krupnick's compensation, absent evidence of agreement otherwise, was to be in accordance with the terms of its offer. Mr. Brown, a Krupnick vice-president, testified on direct examination on behalf of the appellant as follows:

"Q What is the usual method of charging a client in connection with advertising which is placed in their behalf?

"A The only direct charge is usually what we call production. An ad appears in a magazine is actually just a plate, an engraving that is printed, a printer prints a calling card or anything else, but it is much more complex. When an ad is done, first an artist makes a layout. A copywriter writes some copy, what you read in it, the text matter and so forth. A photographer may take a photograph. All of these elements are sort of composed together and then the so-called engraving is made or the plate from which it is printed and this is sent to the magazine. Whether it is Life, Look or Better Homes and Gardens, it is all about the same. The sheer mechanical part is relatively small. Any

particular ad may cost five hundred dollars. It may cost five or ten thousand dollars, depending on the amount, color photograph or if it will be black and white, but these are mechanical charges that are done. Nine-tenths of the work is done outside of our office. We have an art department that perhaps makes the layout. We would write the copy, then an outside studio or photographer would do the art work. Typesetter outside would set the type. Engravers would make the engravings. These are all outside sources that do the actual mechanical work. We are then charged for this work by these people and we add 15 per cent onto these basic charges, or rather, 17.65. It is 15 per cent of the gross.

*     *     *     *     *     *

"Q Do you actually charge for the time of the personnel in the agency?

"A No. This is actually covered—compensation is covered by what the agency gets from the media, by the 15 per cent of the money to pay salaries to the people who put in the time, planning, marketing, merchandising and so forth.

"Q So there are no separate charges to the client for the salaries which are actually paid. That is all included in the 15 per cent commission which is received by the agency, is that correct?

"A Which is received by the agency from the publication, that's correct."

This understanding on the part of the Krupnick official regarding the source and method of Krupnick's compensation is wholly consistent with and in accordance with the terms of their statement of "Invoicing Policies and Compensation."

By the terms of this document, the appellant expressly provided for situations in which commissions would not be adequate to cover costs of the agency and provided for agreement on fees in addition to commissions in such cases. However, there is no contention here that any agreement for additional fees was made between appellant and Branchell and that provision is not relied upon in this case.

■ Appellant's offer, by its terms, provided for termination of the relationship and made express provision for the obligations of the parties in such event. The statement regarding compensation contemplated situations in which the agency would do preliminary work on an advertising program but the advertisements actually not be placed. Paragraph C of this portion of the statement is significant. If advertising copy had been prepared and not used by the termination date, Krupnick was to be paid an amount equivalent to the commission on the media in which the copy was used, if the copy was subsequently used. There is no contention here that any copy prepared by Krupnick was subsequently used by respondents. In view of the express terms of the parties' arrangement, the respondents' liability is to be determined thereunder. Huber Hoge, Inc. v. Smith & Wesson, USDC, Mass., 33 F.2d 923, 925, affirmed (CA 1st Mass.) 32 F.2d 699, cert. den. 280 U.S. 586, 50 S.Ct. 36, 74 L.Ed. 635.

The appellant's action was one for breach of contract, and not in quantum meruit. See H. W. Kastor & Sons Advertising Co. v. Grove Laboratories, (USDC, E.D., Mo.) 58 F.Supp. 1011. Appellant's evidence showed a contract under which a right of termination was given and which clearly defined the rights and obligations of the parties in such event. There was no evidence to warrant the finding of an implied agreement to a different effect. 3 Corbin on Contracts, Section 564, page 292. "When services have been rendered or property transferred in return for an express promise to pay a specified price or compensation, it is a mere truism to say that they were not rendered or transferred in return for an implied promise to pay a different price or compensation. It is more useful to say that, where two parties have expressly agreed on the price or compensation to be paid for specified services or property transferred, it is improbable that those services were rendered or that property transferred in return for an implied promise of a different price or compensation." Ibid. 296.

There is nothing in the record in this case to justify an inference that the parties contemplated that the 1958 advertising program would be handled by Krupnick on terms different from those expressed in its written offer. The record here shows no discussion whatsoever of the subject of compensation in connection with the 1958 campaign. There is no evidence that the plan contemplated the rendition by Krupnick of services different from, or additional to, those contemplated in the original offer. In such circumstances, we can find no basis for an implied understanding to compensate appellant in a manner different from that called for by the written instrument prepared by appellant.

The appellant asserts that the evidence shows, as it does, that Branchell paid production costs and commissions thereon for work done on the 1958 program for advertisements which were not used. Appellant asserts that the liability of the respondents in this regard is the same as their liability for commissions on the entire program and that Branchell, by paying such charges and commissions on production costs, in effect, acknowledged liability for commissions on the entire program. However, we do not consider that this conclusion follows. The statement of compensation policies shows that these two items are considered separately and that, insofar as production costs are concerned, an obligation arises on the part of the client when those costs are incurred, whether or not the advertisement is used. By reason of the obligation to pay such costs, the obligation.

to pay the commission thereon also arises. However, the client is not obligated to pay for media space until media space is actually used and the obligation for commission would arise only at that time.

The Krupnick statement regarding relationship with clients provided for termination of the client-agency relationship on 90 days' notice. There is no objection in this case that the Branchell letter of April 11 did not comply with the 90-day time limitation. In our opinion, the notice was sufficient to terminate the relationship and neither Branchell nor Lenox was thereafter obligated except in accordance with the terms of the written proposal, none of which are here relied upon.

As expressed in the interrogation of Mr. Brown, "Q. Cancellations are one of the hazards of your business, right, sir? A. To a degree, sir." The action which Branchell took was "one of the hazards of the business." Mr. Krupnick, the president of Krupnick, knew of the pendency of the sale of Branchell to Lenox. That the personnel of Krupnick were keenly aware of the potential consequences of the transaction is evident. The appellant introduced a summary of its time records which showed that some 710 hours were spent by Krupnick personnel on the 1958 Branchell advertising program. Some 145 hours of this time are shown by the time records to have been spent subsequent to January 9, 1958, when the news of the completion of the sale to Lenox was received, in preparation and presentation of what the records refer to as the "Lenox pitch." Apparently this effort culminated in a "group pitch to Lenox" on January 31, in which numerous Krupnick personnel participated, but the "pitch" was unsuccessful. The fact that such an intensive effort was made to persuade Lenox to assume the advertising program indicates rather clearly that Krupnick was aware of the hazards and effect of cancellation.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.

## ON MOTION FOR REHEARING OR TO REMAND

PER CURIAM:

Appellant has filed a motion for rehearing before this court, or in the alternative, to remand the cause to the trial court for further proceedings and to allow amendment of its petition to seek recovery on another theory.

The motion for rehearing merely reargues matters considered and disposed of in the court's opinion.

With respect to the motion to remand, appellant states that "the furtherance of justice requires that the cause be remanded to the trial court to permit plaintiff to amend its pleadings and to submit the case on a proper theory. If plaintiff misconceived its remedy and if the contract as pleaded was not proved, there was evidence which would substantiate recovery either on the ground of quantum meruit for the reasonable value of the services rendered by plaintiff or on the theory of a contract which was terminated by defendants effective July 10, 1958 (ninety days after the letter of April 11, 1958) with damages recoverable by plaintiff for breach until the effective date of termination."

In respect to the contention that there was evidence to substantiate recovery on quantum meruit, the express contract which existed between the parties and which was shown by the plaintiff's evidence would preclude recovery on that basis just as the express contract precluded the finding of a contract implied in fact and relied upon by plaintiff in its original petition. Such express contract would also preclude the existence of the contract implied by

**570**

law or quasi contract, necessary to form the basis for recovery in quantum meruit. Perles & Stone, Inc. v. Childs Co., 340 Mo. 1125, 104 S.W.2d 361, 365; 17 C.J.S. Contracts § 6, page 574; 7 C.J.S. Assumpsit, Action of § 9, page 115; 12 Am.Jur., Contracts, Section 7, page 505. This is not an ordinary contract for personal services or work and labor which has been fully performed by the party seeking recovery, with the payment of money by the other party the only thing remaining. See Taetz, Inc. v. Groff, 363 Mo. 825, 253 S.W.2d 824. By its express undertaking, Krupnick agreed that compensation for its services should be derived from specified sources, the major one being commission on media space purchased for advertisements placed on behalf of the defendant clients. This express agreement with regard to the source of plaintiff's compensation negatives the existence of any agreement implied either in fact or by law to compensate them on a different basis.

■ With respect to the notice, the motion for rehearing objects for the first time to the sufficiency of the notice and to its failure to comply with the 90-day terms of the arrangement between the parties. No objection was offered at trial to the introduction of the evidence regarding the termination letter nor was any objection raised originally on the appeal. In any event, we are of the opinion that there is nothing to support a recovery on the basis outlined by the appellant in his motion here. In this connection, the appellant refers to subparagraph B of the provisions of the Client and Agency Working Agreement set out in the opinion. Appellant contends that, under this provision, the advertising agency had the right during the 90-day period to go forward with the placing of the advertisements on which it was working at the time of the termination notice and thereby collect commissions for the work already completed at the time of termination. However, the provisions of the Client and Agency Working Agreement refer specifically, in subparagraph B, to "space * * * used in print

* * * media." According to the evidence, before such space would be purchased, written authorization from the client would have been required. None had been obtained in this case. Therefore, the provision could not have been relied upon and extension of the relationship to the end of the 90-day period from April 11, 1958, would avail plaintiff nothing further in this case.

Therefore, the motion for rehearing or to remand is overruled.