Richard P. JAHN, Jr., Trustee, Plaintiff-Appellant,

v.

McKEE BAKING COMPANY and William B. Tanner Company, Inc., Defendants-Appellees.

Court of Appeals of Tennessee, Eastern Section.

Dec. 4, 1981.

Rehearing Denied Dec. 18, 1981.

Permission to Appeal Denied by Supreme Court March 16, 1982.

Tanner, Jahn, Atchley, Bridges & Jahn, Chattanooga, for plaintiff-appellant.

Louis R. Lucas and G. Dennis Watson, of Picard, Canale, Caywood, Lucas & Watson, Memphis, for defendants-appellees.

## OPINION

FRANKS, Judge.

The issue on appeal is whether Lindsey, Bradley & Johnston, Inc., (LBJ) an advertising agency, was acting as an agent for advertiser, McKee Baking Company, in the purchase of air time from William B. Tanner Company, Inc., a corporation, which purchases blocks of air time from television stations across the United States and, in turn, sells to advertisers.

Specifically, this is a suit by the Trustee in Bankruptcy of LBJ to recover $89,282.50 for television advertisements purchased by LBJ on behalf of McKee during September, 1977. The trustee sued both McKee and Tanner because McKee has paid Tanner and Tanner has agreed to hold McKee harmless if LBJ's trustee is entitled to the payment.

The chancellor determined LBJ was acting as McKee Baking Company's agent in the purchase of air time and dismissed the trustee's suit. We adopt the following from the chancellor's opinion:

> The evidence establishes that Lindsey, Bradley and Johnston Advertising Agency had a contract with the defendant, McKee Baking Company .... And in summary, that contract provided that Lindsey, Bradley and Johnston would prepare an advertising plan for McKee Baking Company; would produce the advertisements; would coordinate with McKee on the actual purchase of air time for the advertisements; and, upon obtaining the approval of McKee Baking, would handle the full purchase of the time for the advertisements.

> For those services, Lindsey, Bradley and Johnston was to be paid $3,666.67 per month, or a total of forty-four thousand dollars a year. This flat fee on a monthly basis would remove the customary 15 percent commission generally charged by advertising agencies. That commission is based on the total charge by the stations airing the advertisements, or broadcasting the advertisements, and as the Court has noticed, it's customarily 15 percent of the total charged by the stations.

> Insofar as Lindsey, Bradley and Johnston and McKee Baking were concerned, McKee Baking was to be billed at the net rate; that is, the normal charge of the stations less 15 percent. And from the evidence, it appears that the parties intended this as a method of ensuring McKee that it was obtaining its advertising at the lowest possible rates; that its charges for said advertising, both by the stations and by Lindsey, Bradley and Johnston, would be readily ascertainable and fixed for any given period of time; and, it ensured Lindsey, Bradley and Johnston of a specific income on an annual basis from McKee Baking Company; that is, $3,666.67 a month, a total of forty-four thousand dollars per year.

> The evidence establishes that the spring flight was duly broadcast; that bills were received by Lindsey, Bradley and Johnston for the air time; that the bills were forwarded to McKee Baking Company; and, that McKee Baking Company forwarded to Lindsey, Bradley and Johnston the amount due to the stations for the advertisements that were broadcast, an amount in excess of one hundred and twenty-nine thousand dollars for all stations and in the approximate amount of one hundred and twenty-nine thousand dollars for air time billed from William B. Tanner Company for the spring flight.

The evidence also establishes that after receipt of the one hundred and twenty-nine thousand dollars or more from McKee Baking Company for the spring flight advertising, that Lindsey, Bradley and Johnston did not forward that payment on to the Tanner Company or their other stations which would broadcast the advertisements.

In the middle of July, following the spring flight, the Tanner Company became distressed that the payments were late and proceeded to meet with various individuals of Lindsey, Bradley and Johnston Advertising Agency with regard to improving the situation. And it was determined that LBJ suffered from a lack of adequate financial controls.

Subsequent discussions and negotiations led to the making of a management agreement dated August 22, 1977. That management agreement provided that the Tanner Company would, in essence, assume complete control of LBJ, and as one witness testified, the employees of LBJ couldn't do anything without the approval of the Tanner Company.

During late August and early September, the Tanner Company and LBJ operated under this management agreement. And during that operation, the Tanner Company learned that, in essence, LBJ was insolvent; that there was, in fact, inadequate financial control; that LBJ had received funds from advertisers and had failed to properly forward those funds to the Tanner Company and other broadcast stations for broadcast time.

An attempt was made to save the Lindsey, Bradley and Johnston Advertising Agency from financial disaster by instituting direct controls, cutting costs by the elimination of personnel, etc.

However, all of that was to no avail when in late September of 1977 two of the principals of the Lindsey, Bradley and Johnston Agency withdrew their guarantees for credit from the First Tennessee Bank, causing the bank to immediately call in its line of credit authorized to the agency. . . .

Subsequent to withdrawal of credit by the First Tennessee Bank in 1977, on October 19, 1977, Lindsey, Bradley and Johnston filed a bankruptcy petition in the U. S. District Court, [Eastern] District of Tennessee. And, subsequent to that bankruptcy petition, pursuant to negotiations between Tanner Company and McKee Baking Company, an agreement was reached, whereby McKee Baking Company would pay to the Tanner Company approximately eighty-nine thousand dollars for electronic media time spots broadcast as part of the fall flight.

McKee's agreement to employ LBJ was oral and was to the effect that LBJ would plan, produce and execute McKee's television advertising campaign for 1977. LBJ's duties included producing the actual television commercials, researching the age-group and geographic markets, buying the actual air time and verifying the stations actually aired the ads as ordered. LBJ was required to obtain prior approval of all facets of the advertising plan from McKee and, according to McKee's advertising supervisor, the monthly fee compensated for "creative, account representation, that is, their liaison with us, placements, media, the production, you know, the whole ball of wax."

As a result of the financial difficulties, LBJ and Tanner entered a written agreement vesting Tanner with the management of LBJ. Tanner advised radio and television stations by letter dated August 29, 1977:

The William B. Tanner Company, Inc. is pleased to announce that it has been appointed by Lindsey, Bradley & Johnston, Inc. to do their media buying effective on or about September 1, 1977.

The Tanner Company will serve as an extension of Lindsey, Bradley & Johnston, Inc.'s media department. LBJ will continue to handle media planning and supervision of these buys in the normal agency manner.

The combination of LBJ's skills and creative staff and the Tanner Company's experience in media placement will greatly expand LBJ's ability to serve its

clients. We look forward to working with LBJ and its clients and continuing our long standing relationship with your station.

We will be contacting you shortly in the process of serving LBJ and its clients.

The disputed advertisements were placed subject to this arrangement as Tanner scheduled the ads, sent them to LBJ's account executive who, in turn, obtained McKee's approval. Under the arrangement, LBJ was utilizing Tanner as its exclusive media buying agency, a function which was one of LBJ's responsibilities to McKee.

As to the monies paid for air time, Tanner billed LBJ the 85% of the gross value of the air time purchased. LBJ verified that the ads had actually been aired and then, on their own stationery, billed McKee for the air time. LBJ billed McKee the exact amount Tanner billed LBJ, having contracted to pass the commission on to McKee. Except for the supplemental 6% commission allowed LBJ by Tanner, LBJ's only compensation for their services came from the monthly retainer paid by McKee. McKee paid the retainer by separate check. When notified LBJ had not paid Tanner for the spring ads, McKee was shocked because they assumed LBJ "funneled" the money to the media. LBJ's agreement with Tanner called for LBJ to pay Tanner as soon as it received the money from the client and no later than 90 days from date of billing. The record supports the chancellor's finding that McKee never intended that LBJ have an interest in the payments for air time purchases. T.R.A.P., Rule 13(d).

The trustee argues Tanner looked to LBJ's credit rather than McKee's since Tanner billed LBJ for the ads and intended to hold LBJ solely liable. This conclusion was rejected by the chancellor and is not sup-

ported by the record. Tanner and LBJ agreed Tanner would be paid as soon as payment was received from LBJ's clients. Tanner representatives testified they dealt with LBJ on the basis of the volume of television advertising done by its clients. LBJ's controller testified Tanner took over management of his company to salvage the large volume of television advertisements placed by LBJ's clients. As to the McKee account, representatives of LBJ and Tanner met with McKee prior to the broadcast of the disputed ads and offered a proposal that McKee pay Tanner directly for the air time. McKee did not sign the agreement [1] but it is evident Tanner was looking to McKee's credit.

We have been cited no Tennessee cases on the issue of whether an advertising agency acts as an agent or independent contractor but the trustee argues the case is controlled by *Columbia Broadcast. Sys., Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369 (2nd Cir. 1975), *on remand sub nom. CBS Inc. v. Stokely-Van Camp, Inc.*, 456 F.Supp. 539 (S.D.N.Y.1977), wherein an advertising agency placed Stokely's ads with CBS. Stokely paid the agency, but the agency bankrupted without paying CBS. CBS was denied recovery on the ground the agency was not the agent of Stokely. The instant case is distinguishable from the *CBS* case. In *CBS*, the advertiser had paid the agency for the ads and, more importantly, the agency's contract with Stokely provided the agency would be solely liable to the media for the air time. While CBS took the position with the agency that the advertisers were also liable, CBS never advised the advertisers of this difference of position and knew throughout the agency had informed Stokely that it had no liability to CBS.

---

1. McKee was advised not to sign the direct payment agreement by Mike Romedy of LBJ because he knew LBJ would be going under soon and felt the ads placed by LBJ would be cancelled, thus rendering the contract useless. The record also indicates Romedy intended at the time he advised McKee not to enter the agreement with McKee to sever his employ- ment with LBJ and start his own advertising agency. It can be inferred he did not wish to see McKee enter an agreement with Tanner so that he could solicit the business, which he did a few months after LBJ bankrupted. Moreover, Tanner's management agreement with LBJ provided Tanner could be paid directly by LBJ's clients for air time purchased thereafter.

A case with similar facts to the instant case is *Oklahoma Publishing Company v. Video Independent Theatres, Inc.*, 522 P.2d 1029 (Okl.1974). In that case, Oklahoma Publishing had run advertisements for Video upon placement by Video's ad agency. Oklahoma Publishing billed the agency and the agency, in turn, billed Video. Video paid the agency but the agency failed to pay Oklahoma Publishing and eventually bankrupted. Oklahoma Publishing sued Video and was awarded recovery on an agency theory although Video had already paid the agency. This decision follows the majority of the courts in concluding an advertising agency has the legal characteristics of an agent[2] and the law of agency generally controls the relationship between the advertiser and the advertising agency. 3 Am.Jur.2d, *Agency*, § 22, pp. 432–3.[3]

We conclude that LBJ was McKee's agent for placing the disputed advertising and McKee's payment to Tanner satisfied the principal's obligation. *See V. L. Nicholson Co. v. Transcon Div.*, 595 S.W.2d 474 (Tenn.1980); *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480 (1955).

We affirm the trial court's judgment and assess costs of the appeal against the trustee and remand the record to the trial court.

PARROTT, P. J., and SANDERS, J., concur.

**2.** *See Fisher v. Trion, Inc.*, 49 Tenn.App. 182, 353 S.W.2d 406 (1961), which states:

Agency, as defined by Section 1 of the Restatement of the Law of Agency, is "the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act." See *Investors Syndicate v. Allen*, 198 Tenn. 288, 279 S.W.2d 497. Agency includes every relationship in which one person acts for or represents another. *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480. "Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts. If relations exist which will constitute an agency, it will be an agency, whether the parties understood it to be or not." *Smith v. Tennessee Coach Co.*, 183 Tenn. 676, 194 S.W.2d 867, 353 S.W.2d, at 408–9.

**3.** *See also* Annot., 53 A.L.R.2d 1139, p. 1140:

In the majority of cases in which the question has been involved, the courts have found that an advertising agency occupied the position of agent of the advertiser. [Footnote omitted.]

For cases embracing this view, *see H. W. Kastor & Sons Advertising Co., Inc. v. Grove Laboratories*, 58 F.Supp. 1011 (E.D.Mo.1945); *Krupnick and Associates, Inc. v. Hellmich*, 378 S.W.2d 562 (Mo.1964); *Ayer v. Devlin*, 179 Mich. 81, 146 N.W. 257 (1914); *Store of Happiness v. Carmona & Allen*, 152 Cal.App.2d 266, 312 P.2d 1104 (1957); *Dolman Co. Inc. v. Rubber Corporation of America*, 109 Cal.App. 353, 293 P. 129 (1930); *Clarke v. Watt*, 83 Misc. 404, 145 N.Y.S. 145 (1913). *Accord: Carpenter v. People, ex rel. Cusack*, 112 Colo. 151, 148 P.2d 371 (1944); *Endsley v. Game-Show Placements, Ltd.*, 401 N.E.2d 768 (Ind.App.1980).