Winslow et al. *v.* Kaiser, Appellant.

Argued December 6, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Nathan J. Bonx,* with him *L. Arthur Greenstein* and *Isadore Katz,* for appellant.

*Abraham M. Rose,* with him *Eli J. Rose* and *Herman Rovner,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, January 15, 1934:

Defendant engaged in trading in grain futures with plaintiffs, who are commodity brokers, with membership in the Chicago Board of Trade. In the course of his dealings, he deposited with them $18,500 as margins on his transactions. Ultimately plaintiffs sold him out because of his failure to keep his accounts adequately covered and when this was done, he was indebted to them in the sum of $5,695.17, which he refused to pay. Plaintiffs brought suit to recover this sum and defendant filed a counterclaim for the amount of his deposit. On the trial of the case the jury rendered a verdict in plaintiffs' favor for the amount of their claim, with interest. From the resulting judgment defendant appeals.

The attitude assumed by defendant is not any too praiseworthy. He employed plaintiffs as his agents to carry on his speculative transactions on the Chicago Board of Trade. They did so in accordance with the rules of that body. At a time in the course of his dealings when his marginal deposits were not sufficient to protect the purchases which plaintiffs had made for his account, after due notice they sold him out. At his request and upon his undertaking to make his margins good, they repurchased his contracts. He deposited with

them $2,000 in cash and gave them a post dated check for a like sum, which was not paid. In asking plaintiffs to reinstate his contracts, he ratified their acts: Clews v. Jamieson, 182 U. S. 461, 483. When again closed out because of his default, he contended in effect that the transactions which plaintiffs carried on for him were invalid in that they had "wholly failed to make the alleged purchases and sales in his behalf." He bases this, not upon proof that plaintiffs did not make the purchases on the Chicago Board of Trade, but upon the proposition that they "matched" their purchase and sales orders.

The course which the transactions took was this: Defendant directed plaintiffs to buy wheat or other grain for him. While plaintiffs were members of the Board of Trade of Chicago, they were not what is known as "clearing members." Actual trading on the Chicago Board of Trade is carried on principally through clearing members. Upon receipt of a buying order from defendant, plaintiffs would telegraph the order to a clearing member in Chicago, without naming their principal. The clearing member then made the purchase and the wheat exchange issued to him a memorandum that the purchase had been made. The clearing broker would inform plaintiffs of this and they in turn notified the defendant in writing. If the clearing-house broker received an order to sell the same kind of grain that plaintiffs' buying order had covered for the same month's delivery, then the purchase order and the sale order were matched or offset against each other by the exchange and the clearing broker would be considered a buyer or seller only as to the difference in the amount of grain. However, under the rules of the exchange, plaintiffs were bound, between the first and the last days of the month in which, under his future contract, he was entitled to receive the grain, to make delivery to defendant of warehouse receipts for the grain which defendant had actually ordered to be purchased.

It may not be inappropriate to outline what the Chicago Board of Trade is and its method of conducting business. This has been done by Mr. Justice HOLMES in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236. He points out that the board was incorporated by special charter of the State of Illinois on February 18, 1859, and that (page 245) "The main feature of its management is that it maintains an exchange hall for the exclusive use of its members, which now has become one of the great grain and provision markets of the world. Three separate portions of this hall are known respectively as the Wheat Pit, the Corn Pit, and the Provision Pit. In these pits the members make sales and purchases exclusively for future delivery, the members dealing always as principals between themselves, and being bound practically, at least, as principals to those who employ them when they are not acting on their own behalf. ...... (page 246) It appears that in not less than three-quarters of the transactions in the grain pit there is no physical handing over of any grain, but that there is a settlement, either by the direct method, so called, or by what is known as ringing up. The direct method consists simply in setting off contracts to buy wheat of a certain amount at a certain time, against contracts to sell a like amount at the same time, and paying the difference of price in cash, at the end of the business day. ...... (page 247) As has appeared, the plaintiff's chamber of commerce is, in the first place, a great market, where, through its eighteen hundred members, is transacted a large part of the grain and provision business of the world. Of course, in a modern market, contracts are not confined to sales for immediate delivery. People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophies, equalizing prices and providing for periods of want. ...... (page 248)

This court has upheld sales of stock for future delivery and the substitution of parties provided for by the rules of the Chicago Stock Exchange. ...... The contracts made in the pits are contracts between the members. We must suppose that, from the beginning as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time and another to sell the same amount at the same time, it would be deemed unnecessary to exchange warehouse receipts. We must suppose that, then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith, for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. ...... The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says. ...... (page 249) It is none the less a serious business contract for a legitimate and useful purpose that it may be off-set before the time of delivery in case delivery should not be needed or desired. ...... It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers or as "pretended" buying or selling, without any intention of receiving and paying for the property bought, or of delivering the property sold, within the meaning of the Illinois act. ...... The sales in the pits are not pretended, but, as we have said, are meant and supposed to be binding. A set-off is in legal effect a delivery."

It should be borne in mind that we are not here dealing with a situation comparable with the purchase and

sale of stocks. Stocks are actually in existence and the broker receiving an order to buy them from a client must make the purchase and receive the certificates in order that the transaction may be vaild: Katz v. Nast, 187 Fed. 529, 535; Cook v. Flagg, 251 Fed. 5, 12;* Greene v. Corey, 210 Mass. 536. See also Meyer, Law of Stock Brokers & Stock Exchanges, page 6 and page 275. Here the transactions had to do with contracts for future delivery of grain which might not be in existence at the time the order was placed for purchase or sale. The rules which are applied to transactions in stocks necessarily cannot be applied to contracts for future delivery of commodities. Ultimately, if the defendant insisted upon delivery of warehouse certificates during the month of delivery under his future contract, he would receive them from the plaintiffs, who would get the certificates from the clearing broker and the only risk that defendant ran in the transaction is the risk which anyone runs in entering into contracts for future delivery, namely, the chance that both brokers would be insolvent and could not make good their commitments. It was testified without contradiction that, if the defendant at the time fixed for delivery had made demand for the actual grain and the clearing broker on balancing his contracts in the grain exchange had not a sufficient amount of wheat purchased by him to his credit, under the rules of the exchange he would have to buy from the exchange or from other brokers the necessary amount to fulfill the plaintiffs' order. "The doctrines of law applicable generally to transactions for undisclosed principals apply to the purchase and sales made by commodity brokers for their customers. Accordingly, a broker who contracts in his own name, without disclosing the identity of his principal, is personally liable as a party to the contract. This is true even though the other contracting party is aware that the broker is an agent only, provided

---

* Certiorari denied, 247 U. S. 508.

of course that the identity of the principal has not been revealed": Meyer, Law of Stock Brokers & Stock Exchanges, page 144. "The broker's personal obligation to perform contracts which he makes for customers arises not only under the principles of law but also under the rules of all or virtually all stock and commodity exchanges. The members of the exchange recognize only each other in their dealings": Ibid. 145.

Plaintiffs do not conduct a bucket shop. They were not betting with defendant on the rise or fall of the market. All that they received out of the transactions carried on for him was the customary brokerage commission on the purchases and sales made, which commissions they divided with the clearing broker in Chicago. In Wilhite v. Houston, 200 Fed. 390, a case growing out of the purchase and sale of grain, the court said at page 391: "According to the instructions given them the orders for sale and purchase of the grain were executed on the boards of trade at Kansas City and Chicago. ...... The plaintiffs had no interest in the sales and purchases they were directed to make, other than as defendant's brokers; and this relation, as between them, was not affected by the fact that in executing defendant's orders the plaintiffs assumed the position of principals towards those they dealt with: Clews v. Jamieson, 182 U. S. 461, 481."

Transactions of purchase or sale on the Chicago Board of Trade are governed as to the legalities of the transactions by the law of Illinois: In re Clement D. Cates & Co., 283 Fed. 541, 545; Hoyt v. Wickman, 25 Fed. (2d) 777, 779. Appellant argues that the lower court erred in charging the jury that the broker's method of doing business was legal under the law of Illinois and that the defendant was bound thereby. We think there was sufficient in the record to warrant the court in so charging. The defendant offered no testimony. If he wished to avail himself of the defense of illegality of the transactions, he should have laid the ground-work by producing evidence which showed it. The same thing may be said

as to defendant's knowledge of and assent to the rules or usages of the Chicago Board of Trade. He knew the transactions which he was carrying on through plaintiffs were effected on the Chicago Board of Trade. This he admits in his affidavit of defense, and had notice of in the confirmations he received. Therefore, he was visited with knowledge of the board's rules which permitted the matching of orders to buy and orders to sell. "A customer in giving authority to a broker to negotiate a transaction in a certain trade or market is presumed, in the absence of evidence to the contrary, to have authorized the broker to transact the business in question, in accordance with the rules, customs, and usages prevailing in that trade or exchange; and this is so, although the client does not in fact know what they are": 9 C. J. 530; Wilhite v. Houston, 200 Fed. 390; Bibb v. Allen, 149 U. S. 481, 489; Clews v. Jamieson, 182 U. S. 461, 481; Bailey v. Bensley, 87 Ill. 556; Mechem on Agency, volume 2, section 2394; American Law Institute's Restatement of the Law of Agency, volume 1, page 91, section 36 (d). "Customers of a member of the board of trade dealing with him as such member must be conclusively presumed to have dealt with him with reference to the rules of the board": Green v. Board of Trade, 174 Ill. 585; Thompson v. Thompson, 315 Ill. 521.

We have given consideration to all the errors assigned; none has merit.

The judgment is affirmed.