COLUMBIA BROADCASTING
SYSTEM, INC., Appellant,

v.

STOKELY–VAN CAMP, INC.,
Appellee.

No. 625, Docket 74–2336.

United States Court of Appeals,
Second Circuit.

Argued March 31, 1975.

Decided June 19, 1975.

**370**

Harold R. Medina, Jr., New York City (Richard M. Hirsch, Cravath, Swaine & Moore, New York City, of counsel), for appellant.

John J. Loflin, New York City (Muriel, Bell, Lord, Day & Lord, New York City, of counsel), for appellee.

Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is brought by a television station and network owner, Columbia Broadcasting System, Inc. (CBS or the medium), from a judgment denying it recovery in its diversity suit against a sponsor, Stokely-Van Camp, Inc. (Stokely), for payment for advertising placed by an advertising agency, Lennen & Newell, Inc. (Lennen or the agency), which went bankrupt. Since the sponsor had paid the agency for the advertising but the agency had not paid the medium, the question is on which party the loss must fall, the medium or the sponsor. The case is especially intriguing since there have been surprisingly few decided cases on the issue of ultimate financial responsibility for radio and television advertising. The United States District Court for the Southern District of New York, Inzer B. Wyatt, *Judge*, granted the sponsor's cross-motion for a summary judgment dismissing the complaint under Fed.R.Civ.P. 56, on two grounds, first, that there was no actual or apparent authority on the part of the agency to bind the sponsor and, second, that the medium was in any event estopped from holding the sponsor responsible.

Stokely, the sponsor, is an Indiana corporation engaged in the production, sale and distribution of food products throughout the United States. Stokely uses advertising, including television commercials, in connection with the promotion and sale of its products. CBS owns a television network which transmits programs to approximately 200 independently owned and operated stations as well as to five stations here involved which CBS also owns outright.

Lennen was a so-called "full service" advertising agency,[1] which had handled Stokely's account for over 17 years on the basis of an unwritten arrangement. On behalf of Stokely, Lennen would produce television commercials, with Stokely's approval, pursuant to an advertising

1. *See* O. Kleppner, Advertising Procedure 572 (6th ed. 1974); C. Dirksen & A. Kroeger, Advertising Principles and Problems ch. 15 (1960). A full service agency provides, inter alia, research; product and market analysis; formulation, presentation and execution of a plan; and other special services. Dirksen & Kroeger, *supra*, at 465.

budget approved by Stokely.[2] Lennen gave Stokely advertising advice and made the arrangements for the advertising. Stokely did not know what contracts, if any, were made by Lennen with the media but did know that Lennen was being paid by means of a 15 per cent commission based on the gross amount of the invoices. Stokely never asked for or received copies of the agency-media contracts and simply paid Lennen on its invoices.

CBS sold time for Stokely commercials both on its network under so-called network agreements dated April 9, 1971, and April 12, 1971, and on the five specific CBS stations under a series of 13 specific contracts running from December 10, 1970, to September 20, 1971. Lennen would prepare and send to Stokely schedules containing the station, date, program and time for each Stokely commercial to be shown during the forthcoming three months on network television and would also advise Stokely of the station, date and time for each Stokely commercial to be shown locally by the CBS television stations. At all times in question under both the network and the station contracts CBS would bill Lennen for the cost of the advertising time less 15 per cent, which is the standard commission in the trade for an advertising agency. In no case did CBS bill Stokely directly or forward to Stokely the CBS agency invoices or any indication of accounting between the agency and the medium. Rather, Lennen would bill Stokely either prior to or following its receipt of CBS invoices.

The bills to Stokely from Lennen would be for 100 per cent of the cost of the advertising, so that upon payment Lennen would receive its 15 per cent "commission." It also appears that Lennen would bill Stokely for certain production costs incurred in connection with the commercials or for other disbursements.[3] The Lennen invoices to Stokely did not refer to the CBS invoices and were on a Lennen invoice form showing a gross, sales tax, cash discount and net. The invoices did not reflect the credit terms in the CBS contracts.

The network and the station billings were separately made by CBS to Lennen, separately accounted for in the CBS books and separately paid by Lennen. With respect solely to network advertising, from August 31, 1970, through September 2, 1971, there were 13 invoices rendered by CBS to Lennen. Only the first four of these were paid by Lennen, the dates of payment being set out in the footnote.[4] The other nine invoices for network commercials total after due allowances for credit $261,684. It is to be noted that Stokely at all times was very prompt, however, in paying Lennen, each payment being within a week or a maximum of two weeks after the date of the CBS invoice to Lennen.

In respect to the station invoices it appears that 31 were rendered by CBS to Lennen (one of which was a revised June, 1971, invoice) between October 30, 1970, and December 31, 1971, of which only seven were paid as set forth in the footnote.[5] No invoice after February 5,

2. Lennen contracted with networks other than CBS, and CBS dealt with Lennen acting on behalf of several advertisers other than Stokely.

3. Production expenses were billed at the rate of actual cost plus a service charge of 17.65 per cent (which is 15 per cent on the gross), a rate which is apparently customary. *See* Kleppner, *supra* note 1 at 577.

4.

| Invoice Date | Amount | Date of Lennen Payment |
|---|---|---|
| 8/31/70 | $61,047. | 11/30/70 |
| 9/30/70 | 20,340. | 1/ 6/71 |
| 4/30/71 | 20,392. | 6/30/71 |
| 6/ 1/71 | 37,204. | 7/30/71 |

5.

| Invoice Date | Amount | Date of Payment | |
|---|---|---|---|
| 10/30/70 | $12,070. | 4/ 2/71 | |
| 10/30/70 | 5,168. | 5/10/71 | |
| 12/ 5/70 | 12,282. | 7/ 9/71 | |
| 12/ 5/70 | 5,168. | 7/ 9/71 | |
| 1/ 2/71 | 7,140. | 7/ 9/71 | |
| 1/ 2/71 | 3,400. | 3/ /71 | credit issued |
| 1/ 2/71 | 1,054. | 3/ /71 | credit issued |

1971, was paid, and the amount due for the assorted station advertising totaled $166,813. The Stokely payments to Lennen on the station advertising followed no consistent pattern, running sometimes as much as 30 days after the date of the CBS invoice to payment a week in advance, with one payment, that of $340 for an August 25, 1971, CBS invoice as early as June 30, 1971.[6] The total of the invoices under the two network contracts and the 13 station contracts is $428,-497.33, for which the action is brought.

It should also be pointed out preliminarily that in respect to the network contracts here relied upon by CBS, the first was initiated by Lennen by verbal order confirmed by letter of Lennen to CBS dated May 4, 1971, stating that Lennen was purchasing "in behalf of" Stokely.

CBS then sent to Lennen a "Network Television Agreement" with a covering letter dated May 25, 1971. The covering letter stated that if the agreement were in order, Lennen should return it to CBS for countersignature, after which "a fully signed copy" would be returned to Lennen. The covering letter, Exhibit C, said, however, "Until any modifications have been mutually agreed upon, the enclosed Agreement shall constitute the understanding between us with respect to this purchase." We agree with appellant, CBS, that the contract was plainly accepted by Lennen by its action in forwarding the commercials to be broadcast, even though no signature and countersignature were obtained. The agreement specifically refers to Lennen as "acting as agent for Stokely-Van Camp, Inc." The agreement incorporates certain obligations running to and from the advertiser, Stokely. Among other things

it provides that "Agency and Advertiser will indemnify and hold harmless CBS and any stations" from and against various claims arising out of the broadcast of the "Agency Package," and conversely provides that CBS will indemnify and hold harmless "Agency and Advertiser" from and against claims arising out of the particular programs which it supplies. (¶ 2.) The agreement also provides that "if this Agreement is with a recognized advertising agency each payment hereunder shall be subject to the deduction therefrom of an advertising agency commission in an amount equal to 15% thereof." (¶ 8(c).) The agency and advertiser under the network agreement (¶ 19) are required to conform to requirements of § 508 of the Federal Communications Act, 47 U.S.C. § 508, and also to make certain warranties and representations. The agreement further provides in Paragraph 5: "(it being understood that Agency acting as agent for disclosed principal)."

The second network contract is the same as the first and was handled in the same way with a covering letter containing the same language and no signatures to the agreement. It seems clear enough in regard to the network contracts that they were in full force and effect despite the fact that they were never signed, the forwarding of the commercials constituting acceptance of the terms by Lennen. See 1 Restatement of Contracts § 63 (1932).

The station contracts were all in writing and signed by CBS and Lennen with the exception of one contract, a signed original of which cannot be located; as did the district court, we will assume that the missing contract was signed. These station contracts are on a stan-

---

**6.** It is to be noted that there is a difference between the CBS network and station divisions' definition of current payment. Because the network division sent out invoices promptly within the month in which advertising occurred, payment was expected by the end of the following month, that is to say, July commercials were expected to be paid for by the end of August. In the stations division, however, because there was delay in mailing the invoices, payment was expected two months after the date of the invoice, since the invoice would be sent and received one month after the date of the advertisement. Thus a January invoice would go out, say, the 15th of February, and payment would be expected by the end of March.

dard form styled "CBS Television Stations National Sales Schedule Agreement." Each refers to Lennen as "('Agency') acting as agent for: Stokely-Van Camp, Inc. ('Advertiser')," and each was signed by Lennen "As Agent for Stokely-Van Camp, Inc." In the basic terms and conditions incorporated in the agreements by reference, each contract is said to have been "entered into by Agency as agent for Advertiser for the broadcast of Announcements over Station . . . ." Unlike the network contracts in respect to payment of the invoices there is a specific provision reading as follows:

> CBS shall bill Advertiser via Agency monthly or weekly whenever CBS shall so elect, for the charges due hereunder for such period. Advertiser shall pay CBS, in accordance with such billing, within ten calendar days after receipt thereof. Any failure whatsoever by Advertiser to make timely payment charges under this Agreement or any other breach whatsoever by Advertiser or Agency of this Agreement shall give CBS the right in addition to its other rights, to cease performance of this Agreement.

In the event that the station omits to broadcast the commercials in question under Paragraph 3D of the station contract the advertiser—not the agency—has the right to terminate the contract. Assorted warranties, indemnity agreements and cross obligations run from the advertiser and agency to CBS and vice versa.

The underlying facts in reference to the estoppel issue commence with Lennen's substantial losses in 1967, 1968 and 1969, and an acquisition in 1970 which was "disastrous" and added to its losses. From sometime in August or September, 1970, CBS knew that Lennen was in financial difficulty, was being paid by Stokely for its television advertising but was not using the payments to discharge its obligations to CBS and was behind in settling invoices of CBS. Lennen's entire outstanding balance due to CBS was never paid up at any time during the period in question. As with other agencies that had financial difficulties, CBS, as its credit manager of collections put it, "went along with the agency and extended a little more time."[7] Because CBS wanted Lennen to survive and to retain its good will, CBS did not notify the advertisers who might otherwise have withdrawn their accounts from Lennen.[8] Thus, CBS at no time advised Stokely of Lennen's financial trouble and never wrote Stokely about its potential liability as advertiser until after Lennen had filed a petition in bankruptcy.[9] In addition, when CBS and other creditors agreed that payments due from Lennen on or before October 31, 1971, could be deferred on condition that payments due after that date would be "on a current basis," CBS did not advise Stokely accordingly.

7. According to an item in the New York Times, "responsible people have charged that lax credit methods helped bury Lennen and Newell. 'Killed them with kindness,' one man said." Dougherty, Agencies and Credit: Will Setup Change?, Feb. 27, 1972, § III, at 17, col. 2.

8. An article written by an executive for a major advertiser and not surprisingly opposing "the liability shift from agency to advertiser" suggests that if advertisers were liable to the media but continued to use their agencies to pay the media there would soon be a takeover of agency functions by the advertiser such as checking telecast or broadcast of commercials, which would ultimately "threaten the survival of the full-service agency." Harvey, Shouldering the Bad Debts, N.Y. Times, June 25, 1972, § III, at 15, col. 3.

9. A CBS controller, Rauchenberger, testified by deposition that "The financial problems with Lennen & Newell at this time [in the fall of 1971] were very well publicized in the advertising pages of the Times." The earliest mention of these difficulties found by this court, however, was on November 9, 1971, where in reference to merger talks there was mention made of "reported money problems" and "a cash-flow problem." N.Y. Times, Nov. 9, 1971, at 79, col. 5. While the same item quotes a Lennen executive vice president as stating that "all clients have been appraised [sic]" of the money problems, there is no evidence in this record that Stokely had been so apprised. *See also* Advertising Age, Nov. 8, 1971, at 1, col. 4; and Nov. 15, 1971, at 1, col. 1.

In meetings in 1970 and 1971 it seemed to have been assumed by CBS that Lennen, not Stokely, was the debtor, for by November 17, 1971, CBS had set up a reserve for loss on the Lennen account and was discussing with Lennen an arrangement for direct payment to CBS in the future by the advertisers and a two- to three-year payout by Lennen on past due items. By that time Lennen owed CBS approximately $714,000 out of total payables of approximately $3 million, and was unable to make payment.

CBS additionally urges, however, that Florida Citrus Commission was a client of Lennen, and when CBS pressed Lennen for payment early in 1971, the Commission asked CBS if the latter would give up the right of recourse against the Commission for advertising. Under date of March 15, 1971, CBS declined to do so. The Commission then asked CBS to send it directly the relevant invoices, which CBS did, and the Commission paid them directly to CBS. No one apparently advised Stokely of this matter. We put no weight on this, however, because the Citrus Commission may have had knowledge of Lennen's situation that Stokely did not.[10]

For what little it may be worth, it is also urged by Stokely that when Stokely received a letter dated November 30, 1971, from a broadcasting station not connected with CBS advising that it would be held jointly liable for advertising, Stokely promptly wrote Lennen that it would "not under any conditions accept joint liability" and that Lennen was "wholly responsible for payment." Under date of December 16, 1971, Lennen wrote Stokely that it (Lennen) had "the sole responsibility for payment to media" in accordance with the "practices of the industry." We say "for what it is worth" because these are essentially statements after the fact[11] so that Stokely's statements could have been made in the light of possible suits by the media and hence have been self-serving, while Lennen's statements (at a time when it could not meet its payments) were clearly intended to reassure Stokely and keep its advertising account going and thus also are not entitled to legal significance.

## AGENCY

We come to the legal issues. The first question is whether the advertising agency, Lennen, was, in its negotiations with CBS under the contracts here involved, acting as an agent for the advertiser or as an independent contractor. If the latter, the matter ends and CBS is entitled to no recovery. The second question is whether the medium, CBS, is, by its actions of extending Lennen credit and not contacting Stokely, estopped to claim the benefits of any agency relationship, should such be found.

The first question depends on whether the action of the agency on behalf of the advertiser was either authorized or apparently authorized or was by virtue of "a power arising from the agency relation and not dependent upon authority or apparent authority." See 1 Restatement (Second) of Agency § 140 (1958).

Interestingly, under New York law, which all of the contracts here in question specifically state governs, the only case at all in point is *Clarke v. Watt*, 83 Misc. 404, 145 N.Y.S. 145 (Sup.Ct.App. Term, 1st Dep't 1973) (2–1 decision), where it was held that in contracting with an advertising agency a weekly paper was entitled to assume that there was a principal on whose behalf the space was being sought so that the paper could look to the advertiser for payment of the space purchased on its behalf and

---

**10.** Indeed, an executive vice president of Lennen, William Lyddan, who was also "top operating executive" on the Citrus Commission account, another Lennen executive, the agency, and the Citrus Commission chairman were indicted in Florida in February, 1971 in connection with the alleged misuse of agency funds. While the indictments were apparently dismissed in September, 1971, evidently the Citrus Commission had been taking some extraordinary precautions after the indictments. See N.Y. Times, Dec. 1, 1971, at 79, col. 3.

**11.** See note 8 supra.

that justice required that the advertiser not reap a benefit, never having paid for it. Judge Wyatt below, however, agreed with Justice Lehman's dissenting opinion in *Clarke,* which held that the agency was either an independent contractor or had been treated as such by the paper which he found to have relied solely on the agency's credit.

As we said at the beginning, the law is curiously sparse in New York, as well as in other jurisdictions, on the subject of the advertiser-advertising agency relationship. Appellant, CBS, relies both upon *H. W. Kastor & Sons Advertising Co. v. Grove Laboratories,* 58 F.Supp. 1011 (E.D.Mo.1945), where in a suit to recover a commission the court said that the advertising agency generally has the legal characteristics of an agent, and *Store of Happiness v. Carmona & Allen,* 152 Cal.2d 266, 312 P.2d 1104 (1957). In *Store of Happiness,* as here, the station billed the agency for the purchase price less 15 per cent commission, and the agency billed the advertiser for the full amount; the agency was held accountable as an agent to its principal for additional amounts retained by the agency in the form of frequency discounts awarded by the station. However, in *Store of Happiness* the advertiser had written the advertising agent confirming an exclusive agency agreement. Here so far as appears there was no such confirmation or any written arrangement pertaining to the relationship between Stokely and Lennen. Appellant, CBS, goes so far as to say, in support of its argument that Lennen is Stokely's agent, that "CBS is without recourse to suit against Lennen on the obligations" and that its "only remedy is against the advertiser," Brief at 9, because under the general rule of law an agent cannot be sued upon the

instrument itself unless there be apt personal contractual words of his own or he sign it as his own. *See, e. g., Levey v. Orcurto,* 73 N.Y.S.2d 202, 204–05 (Sup. Ct.N.Y.Co.1947); *Keskal v. Modrakowski,* 249 N.Y. 406, 408, 164 N.E. 333 (1928). CBS relies upon *Marcus Loew Booking Agency v. Princess Pat,* 141 F.2d 152 (7th Cir. 1944), although there the contract between the advertising agency and the medium contained no provision for payment by the agency. Here the contract expressly provides that Lennen, the agency, must pay CBS.

■ We are thus required to look at the general rules of agency law to determine whether there was here any express or apparent authority or "power arising from the agency relation" on the part of Lennen to bind Stokely as it purported to do on the contracts executed with CBS. We start with the assumption that a person who employs an agent normally intends that he himself shall be a party to the transaction or contract in question, and a third person dealing with the agent normally intends to contract with the principal if the latter is disclosed.[12] *See* 1 Restatement (Second) of Agency, Introductory Note, Topic 2, Title A, at 354 (1958). We also are fully aware that an independent contractor, one who is not subject to the right of another to control his physical conduct in the performance of the undertaking,[13] may or may not be an agent. *Id.* at § 2(3), § 14N.[14] Here by virtue of 17 years of dealings there was a mutual manifestation of consent that Lennen would act on Stokely's account in connection with the latter's advertising. *Id.* at § 15. To determine the extent of an authorization, a court must look to the accompanying circumstances, including

**12.** So saying, we need not and do not pass on the question of liability of the advertiser were the contracts executed by the agency limited to binding the agency only, for payment to the medium.

**13.** Here it could be argued that there were some earmarks of physical control, such as Lennen's changing commercials to suit Stokely's marketing concept, but these are immate-

rial for purposes of determining whether there was an agency relationship.

**14.** The usual "agent," broker, factor, attorney, is an independent contractor (and not a servant) but also an agent. It is only colloquially that the terms independent contractor and agent are necessarily distinct. *See* 1 Restatement (Second) of Agency § 14N, comment a (1958).

the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matter and the circumstances under which the business is done. *Id.* at §§ 34, 35, 36; *Hartford Accident & Indemnity Co. v. Cooper Park Development Corp.,* 169 F.2d 803, 807 (3d Cir. 1948); *Prillaman v. Century Indemnity Co.,* 138 F.2d 821, 823 (4th Cir. 1943). Professional agents can properly assume that they have the authority usually exercised by others in the same field. 1 Restatement (Second) of Agency, *supra* at 334; *Winslow v. Kaiser,* 313 Pa. 577, 584, 170 A. 135, 138 (1934). So, too, a principal, say in Indiana, who does business through an advertising agency on Madison Avenue, can ordinarily expect his agency to do business in accordance with the usages in New York. *See* 1 Restatement (Second) of Agency, *supra* at § 36, comment d and illustrations 4 and 5; *Winslow v. Kaiser, supra.* As to authorization to contract, it may be inferred from authority to conduct a transaction if the making of the contract is incidental thereto, usually accompanies such a transaction or is reasonably necessary to accomplish it. 1 Restatement (Second) of Agency, *supra* at § 50.

■ So saying, it is evident that we have to reverse Judge Wyatt to the extent that he held there was no disputed question of fact and that Lennen had no actual authority to contract with CBS to bind Stokely. Rather, we find there are disputed facts which, if found in CBS's favor, tend to show an agency relation between Stokely and Lennen and the

latter's authority to bind the former to pay for advertising procured on the former's account and for its benefit. Here, for example, when media salesmen called on Stokely soliciting purchase of their particular services, Stokely would indicate that Lennen was its agency and that Lennen should be contacted. How much money was being spent on each particular network, moreover, was left entirely to the discretion of the agency and was unknown by Stokely. From the medium's point of view, it seems to appear that it generally does not sell to an agency without selling to a client; that is to say, sales of time are made only for specific advertisers and not to the agency as a broker for the medium's time. The dealings between CBS and the agency were for purposes of preparing a "package" best suited to the advertising needs of the client in terms of either prime time or daytime, depending on the client and its products to be advertised.

■■ At the same time, particularly because this is a case for all practical purposes of first impression, we believe that we should remand for full factual findings as to the customs and usage of the trade, particularly the usages of the Madison Avenue advertising business as they existed at the time of the execution of the contracts in question,[15] and whether the making of a contract such as the one here purporting to bind the principal is incidental to or usually accompanies or is reasonably necessary to accomplish the business of supplying commercial television time for purposes of sponsors' advertising. What we might assume and what may be found on trial are two different matters.[16] This remand seems

---

**15.** There is some indication that as a result of the Lennen and U.S. Media-International Corp. failures, advertisers have been seeking to use American Association of Advertising Agencies contracts which apparently put sole liability on the agency, Dougherty, *supra* note 7, while media that did not include a clause in their contracts making advertisers and agencies jointly and severally responsible have been seeking to do so. N.Y. Times, Mar. 2, 1972, at 54, col. 4 (Reader's Digest). *See also* Advertising Age, Nov. 15, 1971, at 10, col. 1 (American Business Press, Inc.). We assume that the tri-

al court will particularly concern itself with custom and usage in the television advertising business.

**16.** Even if Stokely had expressly told Lennen not to bind it, if advertising agencies generally executed contracts binding their clients and CBS reasonably believed that Lennen was so authorized, Stokely would be bound. *See* 1 Restatement (Second) of Agency § 161, comment a (1958); *Cohen v. Goldstein,* 128 N.Y.S. 69 (Sup.Ct.App.Term, 1911). *See also Globe & Rutgers Fire Ins. Co. v. Warner Sugar Refining*

particularly appropriate in the light of our requisite remand on the issue of estoppel, as will appear below. It is in accord with recent cases on the subject.[17]

## ESTOPPEL

■ This, of course, does not end the case, because as Judge Wyatt found below, regardless whether Stokely was responsible on the contracts, the principle of equitable estoppel comes into play. Judge Wyatt held that CBS knew at all relevant times that Stokely was paying Lennen but Lennen was not paying CBS, that Lennen had financial difficulties which increased as time went on, that CBS was extending credit on Stokely telecasts far beyond that provided in the contracts and that the creditors were meeting to see if Lennen could be saved. None of this knowledge was communicated to Stokely by CBS, which to be sure was acting in its own interest, hoping to continue receiving the benefits of advertising placed by Lennen, one of the largest agencies, which for years had given CBS major business. Judge Wyatt held that of the two innocent parties, the loss should fall on the party which knowingly took the risk of loss. He also found CBS's claim that Stokely knew of Lennen's financial position in November of 1971 to be without merit. This is true even though by November of 1971 Lennen's financial difficulties were reported, albeit ambiguously, in the advertising column in the financial section of the New York Times. Note 9, *supra.* During November, 1971, Stokely had paid Lennen $672,873.21, of which $37,926.15 represented payment of CBS invoices. As late as December 21, 1971, relying upon Lennen's representations of its sole liability to the media in a December 16, 1971, letter, Stokely made an additional payment to Lennen of $308,510.48, only $188.70 of which was, however, in connection with a CBS invoice. While CBS refers to these payments as naive, the fact of the matter is that CBS never took any steps whatsoever to indicate to Stokely the financial difficulty that Lennen was obviously in and of which CBS was by then clearly aware.

CBS argues that if the principle of estoppel is appropriate the most that it could apply to would be the $39,650.80 of station payments made by Stokely to Lennen in November and December of 1971 on the basis that nothing happened between July 30, 1971, and September 7, 1971, which would cause CBS to doubt Lennen's financial position and on the further basis that all network payments by Stokely to Lennen were completed by September 7, 1971, and all station payments by Stokely to Lennen were paid by June 30, 1971, with the exception of the $37,926.15 in November and $1,724.65 thereafter. But this contention ignores some of the evidence submitted in the affidavits and exhibits below. The vice president-secretary and house counsel of Lennen, for example, stated in his affidavit that he attended meetings with CBS representatives in the summer and fall of 1971 in which CBS was advised generally of Lennen's financial situation and the problems that Lennen had been experiencing for several years. This included information of losses of approximately $600,000 each in 1967 and 1968 and that Lennen had neither given nor been requested to give an audited financial report to any network creditor for three years, although that too is said to have been the general custom in the in-

Co., 187 App.Div. 492, 176 N.Y.S. 3 (1st Dep't 1919).

17. In *American Broadcasting Co. v. North American Van Lines, Inc.,* 65 Civ. No. 3674 (S.D.N.Y. May 28, 1970), not officially reported, then District Judge Mansfield held that where there was an ambiguous contractual arrangement in which it did not appear that the agency was acting as an agent of the advertiser or for itself summary judgment for the me-

dium would be denied. So, too, in *Washington Broadcasting Co. v. Goozh Gifts, Inc.,* 118 A.2d 392 (Mun.Ct.App.D.C.1955), relied upon by the appellee, the agency's method of operation was to purchase available media time on its own account and broker it among various advertisers. Here, as above stated, CBS dealt specifically with respect to a known sponsor whose products were to be advertised.

dustry.[18] By the summer of 1971 Lennen's financial picture was critical and its payroll and other expenses were sharply reduced and according to this same affidavit CBS knew this. CBS also was advised, this same affidavit indicates, that Lennen had taken moneys received from its clients including Stokely for the payment of pressing media bills, regardless of the client involved, in an attempt wherever possible to decrease the total past due obligations.

The former CBS credit manager, Louis W. Werle, testified in deposition that during various discussions in 1970 and more particularly in 1971 it was his understanding that Lennen's clients had paid them but that they "just simply had not turned over the money to CBS." Our problem is that on the basis of the conflicting affidavits it cannot be known at just what time it became clear that CBS should have spoken to or contacted Stokely directly. The determination will include resolution of when CBS became aware of Lennen's problems, an issue not suitable for summary judgment, resolution of whether CBS was reasonable to rely on its alleged belief that Stokely knew, and resolution of how long CBS acted reasonably in believing that Stokely would suffer no detriment from CBS's extending credit to Lennen.

The testimony of the former credit manager of the CBS stations division, Marvin Schrager, on deposition highlights the problem. He said, "I think early in 1971 we did get some satisfaction, some checks came in. Exactly where in the year, we actually found out that they were in serious financial difficulty, I really don't remember when it was. But up until a point we were getting some money from them." Again, "As I said before I don't remember exactly when the situation really got bad what month but of course when it did get bad then I would speak to Lou [the CBS credit manager] about it a lot."

It is true that Lennen became delinquent in the summer of 1970 and that CBS began contacting Lennen and following up the question in the fall of 1970. But Lennen was current by the end of the year 1970 or early January 1971 and was fairly current in the spring of 1971. Evidence at trial may prove that there came a time, however, perhaps as early as June, perhaps earlier, perhaps as late as August of 1971, but not later, when it appeared that Lennen was in substantial financial difficulty, and this situation was known to CBS and unknown to Stokely. It is that time at which estoppel took place. It was at that time at which CBS could not be considered to be dealing any longer with an agent for an advertiser but must be treated as dealing with a party on whom it solely relied and in whom it trusted, having in mind its own best benefit—the continuation by Lennen of the placing of advertising business with CBS. At that time CBS had a duty to advise Stokely that it would look to it for payment and it is estopped from doing so as to billings accruing thereafter.

The New York law of estoppel is that the duty to speak need not be a purely legal one, *Simmons v. Westwood Apartments Co.,* 46 Misc.2d 1093, 261 N.Y.S.2d 736, 740 (Sup.Ct. Onondaga Co. 1965), *aff'd on other grounds,* 46 Misc.2d 1093, 271 N.Y.S.2d 731, *appeal denied,* 18 N.Y.2d 786, 275 N.Y.S.2d 271 (1966), but rather may be founded in principles of ethics and good faith: when one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship. *Cf. Armour & Co. v. Celic,* 294 F.2d 432, 437–38 (2d Cir. 1961). It is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead. *Rothschild v. Title Guarantee & Trust*

---

**18.** This too has evidently been a "custom" that may have changed since the Lennen and U.S. Media-International Corp. failures. The Institute of Broadcast Financial Management is said to have proposed setting up a credit review bureau for radio and television. *See* Harvey, *supra* note 8.

*Co.,* 204 N.Y. 458, 462, 97 N.E. 879, 880, 139 A.D. 672, 124 N.Y.S. 441 (1912).

It is important to note here, moreover, that the contracts themselves that are relied upon by appellant call for prompt payment. Paragraph 8 of the Network Television Agreements states that "Time of payment hereunder is of the essence." Paragraph 6A of the Television Stations National Sales Schedule Agreements provides that "Advertiser shall pay CBS, in accordance with such billing, within ten calendar days after receipt thereof." While the credit was normally extended to the agency, as indicated, to the end of the following month on network billings and to the end of the month after the invoice was sent on station billings of a previous month, the fact remains that CBS was extending substantial credit to Lennen over and above the ordinary anticipated times for payment. For example, on its network accounts receivable from clients represented by Lennen on which there were billings of between half a million and a million dollars a month from August to December of 1970, there were $15,000 to $20,000 that were over 90 days due. By the end of February, 1971, this overdue balance had been reduced so there was only $373 overdue. While in April there were billings in excess of $1 million, only $42,448 was 90 days overdue. From April 30, 1971, through September 30, 1971, the 90 days overdue constantly ran under $1,000, only to jump to $84,549 as of November 24, 1971, and $288,753 as of November 30, 1971.

The station accounts receivable from advertisers represented by Lennen, however, did not present such a pretty picture. From January through July, 1971, at all times the 90 days overdue accounts ran under $100,000, but for the most part over $50,000.

On combined network and station accounts it was in April, 1971, that accounts due over 90 days reached $100,-000, representing a total of 10 per cent of the accounts receivable from advertisers represented by Lennen, a healthy sum to be so long overdue. From May, 1971, through July, 1971, at all times the total over 90 days accounts ran between $49,000 and $88,000.

■ We think that the analogy to the law of suretyship suggested by the appellee, and by implication by the court below, is quite apt: where a creditor extends the time of payment of the principal debtor, the surety may be discharged as to payments due thereafter from the principal debtor to the creditor. *British Supreme Cloths, Ltd. v. Futura Fabrics Corp.,* 34 A.D.2d 642, 310 N.Y.S.2d 47 (1st Dep't 1970), *aff'd,* 28 N.Y.2d 727, 321 N.Y.S.2d 114 (1971); *National Park Bank of New York v. Koehler,* 204 N.Y. 174, 97 N.E. 468 (1912). *See also Hall & Co. v. Continental Casualty Co.,* 34 App. Div.2d 1028, 310 N.Y.S.2d 950 (3d Dep't 1970). The problem is to ascertain by specific findings on the basis of evidence when an extension of credit took place that was over and above the normal amount that would in the ordinary course of events not be deemed unusual in the trade. For this purpose we cannot make a judgment on the basis of the record before us. Indeed, we think this is an issue of fact which along with the issues of CBS's and Stokely's respective knowledge as to Lennen's financial position is also in dispute and as to which summary judgment cannot accordingly be granted.

Accordingly, we remand to the district court for the purposes of determining whether there was an agency relationship and the time that estoppel took effect in accordance with this opinion.