**CBS INC., Plaintiff,**

v.

**STOKELY–VAN CAMP, INC., Defendant.**

No. 72 Civ. 1687.

United States District Court,
S. D. New York.

Oct. 4, 1977.

540

Cravath, Swaine & Moore, New York City, for plaintiff; Harold R. Medina, Jr., Evelyn M. Finkelstein, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant; John J. Loflin, Daniel E. Orren McNulty, New York City, of counsel.

WYATT, District Judge.

This is the decision after trial to the Court without a jury of a diversity civil action in which plaintiff (CBS) claims $390,382.48, with interest, from defendant (Stokely) for television advertising. This advertising had been placed for Stokely with CBS by a large advertising agency, Lennen & Newell, Inc. (Lennen). Stokely had paid Lennen for the advertising, but Lennen, which went into bankruptcy on February 2, 1972, did not pay CBS. The issue is thus whether the loss falls on CBS or on Stokely.

Both sides moved for summary judgment. This Court granted summary judgment to Stokely. On appeal, the summary judgment for Stokely was reversed as inappropriate. 522 F.2d 369 (2nd Cir.). The action was remanded for specific determinations, described in the opinion of Judge Oakes, after a trial. There was a trial on January 24 and 25, 1977.

1.

The remand was to determine after trial (a) "whether there was an agency relationship" between Stokely and Lennen, and (b) "the time that estoppel took effect".

As to the "agency relationship," it was directed that there be findings (1) "as to the customs and usage of the trade, particularly the usages of the Madison Avenue advertising business" and (2) "whether the making of a contract such as the one here . . . is incidental to or usually accompanies or is reasonably necessary to accomplish the business of supplying commercial television time for . . . advertising". The "customs and usage" referred to is assumed to be with respect to advertising agencies having authority to make contracts binding their advertiser clients to pay to television broadcasters, and actually exercising such authority.

As to the time when estoppel took effect, this was held to be the time "when it appeared that Lennen was in substantial financial difficulty, and this situation was known to CBS and unknown to Stokely."

2.

Advertising agencies developed before radio and television. In those days they bought space in newspapers and magazines as principals. They resold the space to advertisers, but if they failed to resell the space the advertising agencies were still liable for it. In order to make sale of the space easier, the early agencies employed writers to produce advertising copy which could be shown to the space prospects; such were the beginnings of the present extensive advertising agency industry. But in those beginning days the publishers of

newspapers and magazines looked to the credit of the advertising agencies and not to that of the advertisers; the publishers did not deal with the advertisers but only with the agencies.

The advent of radio did not change this. The time on radio was bought by the agencies as principals and on their own credit.

When television came, the situation again did not change at first. The television networks, including CBS, accepted the concept that the agencies were solely liable for advertising time purchased, the same concept early adopted and promoted by the agencies themselves.

The trade association for advertising agencies is the American Association of Advertising Agencies, often called "the four A's", here sometimes referred to for convenience as "AA". The larger agencies are members of AA, 400 out of the about 7000 total number of agencies; AA members place 75% of all TV and other advertising. Since at least as far back as 1930, AA has advised a form of contract for advertising between agency and medium which provides that the agency would solely be liable for advertising purchased, and that the advertiser would not be liable. The AA and the larger agencies (including Lennen) believed in this position, believed it was correct also as a matter of law, and promoted it actively in booklets, speeches and the like.

The position of the agencies that the advertiser is not liable to the medium is in part for selfish reasons. The agencies want no direct dealings between the advertisers and the media, lest this evolve to an elimination of the agencies. The custom and usage has always been, and is now, that CBS and other media send their invoices only to the agencies, that the agencies pay the media and that the agencies (rather than the media) collect from the advertisers. This increases the cash flow through the agencies and is believed by them to improve the standing of the agencies with their banks. The agencies did not want the system changed to one where the advertisers pay directly to the media. Moreover, the position of the agencies, explained to their client advertisers, makes it easier to collect from the advertisers. They are assured by the agencies that there is no possibility of the advertiser paying twice, once to the agency and later to the medium, as would be the case if the present claim of CBS is valid.

As the volume of TV advertising increased, and the money involved as well, CBS and presumably other networks became concerned that the advertisers be liable ultimately for the advertising time bought for them. In the case of big advertisers, their financial responsibility was much greater than that of the agencies. CBS (and no doubt the other networks) revised its form of contract, at some time between 1950 and 1955, so as to provide that the contract was made with the agency "acting as agent" for the advertiser (who was named in the contract). The contract forms were sent by CBS to the agencies for signature.

The agencies did not sign the network contracts; the network contracts in suit have no signatures of either party. The reason is that the agencies did not wish to compromise their position that the advertiser clients were not liable to the media.

The station contracts were signed by Lennen and by CBS and these contracts did have the language of agency. There is some evidence (Ex. 12, p. 12) that another large agency made the same distinction, refusing to sign network contracts but signing station contracts. Why there should have been any distinction between the two types of contract is not made to appear.

The evidence does establish that there was during the relevant period (1969–1971) a difference of position and opinion between the agencies and AA on the one hand and CBS on the other; the agencies and AA asserted that the agencies were solely liable; CBS asserted that the advertisers were also liable.

CBS, however, did nothing to inform the advertisers of this difference of position. CBS had no dealings with the advertisers, knew that the larger agencies (including

Lennen) asserted that the agencies were solely liable, and knew full well that the advertisers had been advised by the agencies that the advertisers were not liable to CBS. The reason for the conduct of CBS is clear; CBS wanted to be able in an emergency, as in the case at bar, to assert its legal position that the advertiser was liable on the contract; at the same time, CBS wanted to retain the good will of the agencies who placed 75% of the advertising with CBS; CBS did not want to antagonize the agencies, whose good will CBS was constantly seeking, by informing their advertiser clients of the legal position CBS was taking with the agencies.

As an example, in 1969, 1970, and 1971 the auditors of CBS verified the accounts receivable of CBS. These auditors obtained confirmations of the amounts due for television advertising; these confirmations were sought and obtained from advertising agencies only. No verification was obtained from the advertisers and no communication with them was had. CBS itself knew of and apparently dictated this procedure. CBS itself wrote to the *agencies* asking for confirmation of the accounts receivable.

At the time of the execution of the contracts in suit, the custom and usage in the television advertising business was that agencies advised their advertiser clients that the advertisers were not liable to the networks but that the agencies were solely liable; that the agencies took this position with the networks; that the advertisers did not see or know the form of the contracts tendered by the networks and that CBS knew of this ignorance on the part of the advertisers; that CBS was not willing to force the issue with the agencies and never made known its legal claim to the advertisers, and that the issue was never forced until in the case at bar.

There is no evidence that "advertising agencies generally executed contracts binding their clients". 522 F.2d at 376 fn. 16. The evidence is to the contrary. Sometimes and rarely such contracts were signed by agencies but not "generally." As a CBS executive testified (Ex. 8, p. 35) "The trade practice is to make deals without signing agreements . . . very few of them are ever signed." After the contracts were revised by the networks to attempt to impose liability on the advertisers by language in a contract form sent only to the agencies, the latter generally declined to sign the contracts because they were inconsistent with the position that the agencies were solely liable to CBS and to the other networks. The evidence establishes that CBS did not believe, and could not reasonably have believed, that Lennen was authorized to bind Stokely. CBS knew that the AA agencies, including Lennen, asserted that the advertisers were *not* liable to CBS and to other media; and knew that this was told by the agencies to their clients. CBS studiously avoided raising the issue with Stokely or giving any information on the issue to Stokely.

It remains to find whether "the making of a contract such as the one here purporting to bind the principal is incidental to or usually accompanies or is reasonably necessary to accomplish the business of supplying commercial television time for purposes of sponsors' advertising." 522 F.2d at 376. The recital of the factual situation already made shows that the making of such a contract did not accompany, was not incidental to, and was not necessary to secure time for sponsors. This is evident because there has never been any resolution of the open issue whether the advertiser was liable or not. CBS knew that the larger agencies believed the advertiser not to be liable; as a CBS executive testified (SM 50): "That is one of the open items in our contract". Until the Lennen bankruptcy, the issue had never been faced—yet time for sponsors was obtained.

In this state of affairs and attempting to follow the guidelines of the Court of Appeals, I am still unable to find any actual or apparent authority from Stokely to Lennen to bind Stokely to pay CBS; thus, I find that there was no "agency relationship" between Stokely and Lennen in this respect.

### 3.

The second matter to determine is when CBS knew that Lennen was "in substantial financial difficulty" and Stokely did not know. 522 F.2d at 378.

As for Stokely's knowledge, the evidence establishes clearly that Stokely had no knowledge of any Lennen financial difficulty until January, 1972 (for example, SM 109, 110; Ex. 5, p. 19). Indeed, Stokely was paying Lennen large sums as late as December 21, 1971, when Stokely paid Lennen $308,510.48, some of which was for CBS time; between November 5, 1971, and December 21, 1971, Stokely paid Lennen a total of $981,383.69 (Exs. I–L). No such payments would have been made had Stokely any idea that Lennen was in financial trouble and that Stokely might have to pay the same amounts a second time.

As for the knowledge of CBS, this obviously was much earlier and greater than that of Stokely but to say exactly when CBS had such knowledge requires more study.

Lennen's financial troubles began in 1966 when a major client left Lennen and thereby reduced the revenues of Lennen from $4,200,000 to $1,200,000. The loss of the major client was known in the advertising industry at the time; this and the general decrease in Lennen revenues must have been then known to CBS.

Lennen lost $800,000 in 1966 and $600,000 in 1967. There is no evidence that the amount of these losses was known to CBS but by 1969 Lennen had begun to present to CBS forecasts of its income, operating expenses, and present and anticipated profits or losses.

In 1968 Lennen was late in its payments to CBS and as a Lennen official testified (Ex. H, p. 15): "CBS knew by our late payments as early as 1968 that we were having trouble meeting payments". Werle of CBS was then making constant phone calls to Lennen. In fact, Lennen had been "a slow pay agency from the latter part of 1967 . . ." (Ex. H, p. 17). The situation seems to have improved at the end of 1969 because Lennen sold stock in Lorillard which it owned and which "was the only asset we had remaining" (Ex. H, p. 16); thus, there was "a sort of catch up thing at that time" (Ex. H, p. 16).

In 1970, however, Lennen fell seriously behind in its payments to CBS and by August and September Lennen was about three months behind (Ex. 6, p. 8).

There was a credit group in New York, of which CBS was a member, which each month reported "past due" amounts of advertising agencies to all members. The report for July 1970 shows that Lennen had almost $600,000 in "past due" amounts and that for August 1970 shows almost $660,000 as "past due" from Lennen, some of which went back to December 1969.

As to amounts due by Lennen to CBS itself, an invoice for $61,047 dated August 31, 1970 was not paid by Lennen until November 30, 1970; an invoice for $20,340 dated September 30, 1970, was not paid by Lennen until January 6, 1971; an invoice for $12,070 dated October 30, 1970, was not paid by Lennen until April 2, 1971; an invoice for $5,168 dated October 30, 1970, was not paid by Lennen until May 10, 1971; two invoices dated December 5, 1970, and aggregating over $17,000 were not paid by Lennen until July 9, 1971.

In 1970 Lennen's financial situation was worsening. As noted above they were slow on their payments to CBS and in August and September 1970 they were three months behind; they were in a "cash flow bind" (Ex. 6, p. 10); CBS was calling for payment every month (Ex. 7, p. 11); as a CBS executive admitted, Lennen had then fallen "substantially behind" (SM 43). By 1970, it appeared that the condition of Lennen was "even worse than before" (SM 158).

CBS knew in 1970 and earlier that the financial difficulty of Lennen was not because the advertisers, Stokely in particular, were not paying Lennen. CBS knew that Stokely and the other advertisers were paying Lennen promptly (for example, Ex. 6, pp. 10, 46; Ex. 8, p. 22) and knew that Lennen was not passing the sponsor pay-

ments to the media for which they were intended but that Lennen was diverting the payments elsewhere. CBS had this knowledge in 1970 (and probably earlier).

By at least the fall of 1970 CBS knew that the sponsors were paying Lennen, that Lennen was not turning the payments over to CBS, and that this meant that they were diverted elsewhere, the "lateness" was "in house". Such is established, among other evidence, by the testimony of Werle of CBS (for example, Ex. 6, pp. 10, 11). This knowledge by CBS, without more, shows in my view that CBS then—fall of 1970— knew that Lennen was "in substantial financial difficulty".

In 1970 CBS representatives went after Lennen to try to get its payments more closely to a contract basis. There were personal meetings by CBS (Ex. 6, p. 9); there were monthly telephone calls (Ex. 7, p. 11); there were frequent luncheon meetings (Ex. 8, p. 20); according to a Lennen executive, CBS met with them about the credit situation "in 1970 constantly" (SM 149); in the fall of 1970, CBS was "always interested" in how Lennen was doing and "what we were doing to try and get on a current basis" (SM 150).

In 1970 Lennen "tried one final thing" (SM 148), a merger with another agency. This turned out to be a disaster because the other agency had about half the billings expected but all of the expected overhead. Lennen in 1970 told CBS that the merger had made its financial condition worse; that it "fell far short of expectations" and "they had cut their staff substantially" (Ex. 8, p. 19); that a 20% layoff of staff was recommended (SM 150). After the merger in 1970, the result was "disastrous" and "made matters worse" (Ex. H, p. 16); it threw Lennen "in a tremendous bind which was worse than anything we had ever had before" (Ex. H, p. 19). In view of the frequent contacts between CBS and Lennen, all this must have been known to CBS.

CBS in 1970 reacted to the bad situation at Lennen by increasing its oversight; the visits to Lennen were made more frequent. But, of course, nothing of this was told to Stokely.

In 1970 also arose the incident of the Florida Citrus Commission ("Citrus"), another client for which Lennen was placing ads with CBS.

In the fall of 1970 the Citrus account with CBS fell behind and Citrus itself learned of late payments on its behalf by Lennen to CBS, apparently as the result of an audit of Lennen by Citrus. There were many discussions of the Citrus matter between CBS and Lennen. Citrus asked through Lennen if CBS would look only to Lennen for payment. CBS declined and ultimately put in writing, in a letter to Lennen dated March 15, 1971, that it would not give up its "right of recourse" against Citrus (Ex. 3, PP). Citrus at some point in 1970 or early 1971 began to pay directly to CBS rather than to Lennen. It is not easy to fix dates exactly from the evidence but I conclude that the substance of the Citrus incident took place before the end of 1970. In part, I rely on the testimony of Rauchenburger of CBS: "I am talking about 1970 not '71. This is when the question came up about the Florida Citrus account." (Ex. 8, p. 19). The Citrus incident in 1970 shows that CBS knew then that Lennen was in "substantial financial difficulty" and that Citrus was sufficiently alarmed by that fact to prefer to pay CBS directly—a "relatively unusual" arrangement (Ex. 8, p. 15).

Of course, the situation of Lennen grew steadily worse in 1971 and in early 1972 came the bankruptcy. The evidence, however, satisfies me that CBS knew not later than the end of 1970, Lennen was in "substantial financial difficulty". "Substantial financial difficulty" is not taken by me to -mean so bad that collapse is imminent or even probable. Doubtless CBS hoped until the end that Lennen, a major customer, would survive but it certainly knew at the end of 1970 that financial collapse was a possibility. Yet CBS had no contact with Stokely until after the bankruptcy when its first demand on Stokely for payment was made.

Based on the foregoing findings, the Clerk is directed to enter judgment in favor of defendant.

SO ORDERED.